**In the Matter of DOLLY MADISON INDUSTRIES, INC. and its subsidiaries, Debtor.**

**No. 70–354.**

United States District Court, E. D. Pennsylvania.

Nov. 27, 1972.

---

See also D.C., 326 F.Supp. 441.

David O. Williams, Landis & Williams, Lansdale, Pa., for intervenor.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for trustee.

## OPINION AND ORDER

HANNUM, District Judge.

Presently before the Court is a petition by the Trustee of Dolly Madison Industries, Inc. ("DMI") for review of an Order entered by the Referee in Bankruptcy acknowledging the priority of the claim of Helen K. Groff to certain shares of Witchwood Farm Country Kitchen stock.

The Referee found as a fact that on July 17, 1968, Helen K. Groff sold to American Furniture Leasing, Inc.

("AFL", later Dolly Madison Leasing and Furniture Corp., "DML&F") all of the issued and outstanding stock of Witchwood Farm Country Kitchen, Inc., being 161 shares of Class A Common Stock and 320 shares of Class B Common Stock. The sale was accomplished by means of three separate documents, a purchase agreement, a promissory note, and an escrow agreement, all executed on the same date. The purchase agreement set forth, *inter alia*, the terms of the sale and the warranties of the seller. The unadjusted base price of the stock was established at $206,400.00. In anticipation of entering this agreement and pursuant to its terms, Mrs. Groff caused new stock certificates to be registered in the name of AFL. In return for the stock certificates, AFL paid Mrs. Groff 29% of the total purchase price in cash and gave her a promissory note for the balance. The note was payable in three equal annual installments of $53,586.21. Payments were due on January 2 of 1969, 1970 and 1971, together with 6% simple interest on the annual unpaid balance.

At the date the purchase agreement and note were executed, the stock certificates registered in its name were transferred to AFL. Thereafter Mrs. Groff, AFL, and Hugh Moulton, Esq. entered into an escrow agreement as required by and pursuant to the purchase agreement. Accordingly, AFL endorsed the new stock certificates in blank and delivered them into the possession of Hugh Moulton, Esq. As escrow agent, he was instructed by both Mrs. Groff and AFL to hold the shares until either the balance of the note was paid, whereupon he was to deliver them to AFL, or until he was given notice by Mrs. Groff of an uncured default in the payment of annual installments, whereupon he was to deliver them to Mrs. Groff.

Paragraph 1(b)(3) of the purchase agreement contained the following provision:

> "In the event that AFL shall be in default in the payment of principal or interest under its promissory note . . . and if said default shall not be cured within five days after receipt by AFL of notice thereof from seller, then the escrow agent, upon notice thereof from seller, shall deliver the certificates to seller, *whereupon* seller's rights and obligations in and to the shares represented by the certificates . . . shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code as in effect in the Commonwealth of Pennsylvania." (emphasis added)

The same provision was incorporated by reference into the escrow agreement instructions.[1]

After the above-mentioned agreements were entered into, the January 2, 1969 and 1970 annual installments were duly paid by AFL and received by Mrs. Groff. After the January 1970 payment only one installment remained. On June 23, 1970, DMI, including DML&F, filed a Chapter X Bankruptcy Reorganization Petition. To date, the final installment of $53,586.21 due on January 2, 1971, together with interest at 6% from January 2, 1970 to January 2, 1971, has not been paid to Mrs. Groff. Mr. Moulton continues to hold the Witchwood stock.

On January 5, 1971, the Trustee of DMI and its subsidiaries filed with this Court an application for an order directing Hugh Moulton to turn over the stock in his possession to the Trustee. The

---

1. Paragraph 2(c) of the escrow agreement provides:
   "(c) In the event that AFL shall have defaulted in any payment of principal or interest due under the Promissory Note and you shall have received from Helen K. Groff a notice pursuant to paragraph 1(b)(3) of the Agreement to the effect (a) that AFL is in default in the payment of principal or interest under the Promissory Note, (b) that Helen K. Groff has given notice thereof to AFL and (c) that said default was not cured within 5 days after receipt of said notice by AFL, you shall mail the Certificates, registered mail return receipt requested, to Helen K. Groff . . . ."

Court referred the matter to the Referee in Bankruptcy for a hearing. On October 14, 1971, Hugh Moulton having filed an answer and Mrs. Groff having been granted leave to intervene, the hearing was held. On January 14, 1972, the Referee entered an opinion and order granting the Trustee's application only upon the condition that he pay Mrs. Groff in full for the balance of the purchase price, thus granting Mrs. Groff the status of a secured creditor. The Trustee has filed the present petition to review the Referee's order.

From the established facts, there can be no doubt that the manner in which the sale was transacted was designed to provide the seller with some form of security interest in receiving the agreed upon price and the buyer with some assurance that the stock deposited as collateral was not within the unrestricted control of the seller. The present dispute concerns the nature of the security interest intended and, more importantly, the time when it was to attach.

At the hearing below, the Referee adopted the argument advanced by Mrs. Groff that the combination of agreements entered into between the parties on July 17, 1968, coupled with AFL's transfer of the stock certificates to Hugh Moulton, constituted a security agreement in the nature of a pledge. Citing sections 9–304(1) [2] and 9–305 [3] of the Uniform Commercial Code, the Referee concluded that, "The receipt of the stock certificates by the escrow agent, Hugh G. Moulton, was in effect receipt by the Seller and the security interest of the Seller was perfected at that time far in advance of the bankruptcy action." [4] Assuming the validity of the Referee's conclusion, Mrs. Groff's security interest would have attached and been perfected as of July 17, 1968, and the Trustee, having been appointed in June of 1970, would have taken title to the stock certificates subject to it.

The Trustee, on the other hand, has advanced a more intricate analysis. In his view, the July 17, 1968 purchase agreement constitutes a written security agreement within the meaning of section 9–204(1).[5] Relying upon the last sentence of that section he argues that although the purchase agreement provides for the creation of a security interest, the express language of the agreement postpones the time at which the interest was to attach by making attachment contingent upon (1) default by AFL followed by (2) notice to Hugh Moulton and (3) actual receipt of the stock by Mrs. Groff: "Whereupon seller's rights and obligations in and to the shares represented by the certificates . . . shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code." Assuming the Trustee's position to be correct, Mrs. Groff would not have had a perfected security interest at the time the Trustee was appointed and therefore would not have a claim to the stock superior to his.

In this Court's opinion, the legal relationship existing between the parties is more accurately described by the Trustee. Although his reliance upon a straight reading of section 9–204(1) is in itself compelling, there are additional

**2.** Section 9–304(1), 12A P.S. § 9–304(1), provides, in pertinent part, as follows: "A security interest in instruments (other than instruments which constitute part of chattel paper) can be perfected only by the secured party's taking possession . . . . "

**3.** Section 9–305, 12A P.S. § 9–305, provides, in pertinent part, as follows: "A security interest in . . . instruments . . . may be perfected by the secured party's taking possession of the collateral."

**4.** Record, 80.

**5.** Section 9–204(1), 12A P.S. § 9–204(1), provides as follows:
"A security interest cannot attach until there is agreement (subsection (3) of Section 1–201) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place *unless explicit agreement postpones the time of attaching.*" (emphasis added).

reasons supporting the Court's view. They stem, for the most part, from the fact that Mrs. Groff's position completely ignores the existence of the escrow agreement.

██ There can be no doubt that the escrow agreement entered into on July 17, 1968 was one in fact, not merely form. There is simply no evidence that the parties intended anything otherwise. Mrs. Groff's position to the contrary notwithstanding, the simultaneous existence of an escrow and a pledge is a legal impossibility. Qualley v. Snoqualmie Valley Bank, 136 Wash. 42, 238 P. 915 (1925).

██ It is fundamental to the existence of a pledge that the pledgor give up possession of his property and place it in the hands or control of the pledgee. Although possession by the pledgee may be accomplished through the use of an agent, the pledgee must have absolute dominion and control over the property. Qualley v. Snoqualmie Valley Bank, *supra*; 72 C.J.S. Pledges § 19b(6) (1951); *see*, Uniform Commercial Code § 9–305, Comment 2. Fundamental to the existence of an escrow is the transfer of the escrow instrument into the hands of a third party as depository. Prior to the happening of any of the conditions upon which the escrow agreement operates, the escrow agent is not empowered to act for either party. Although he may be an agent for one of the parties in other respects, with respect to the instrument in escrow his powers are solely limited to those stipulated in the escrow agreement. Zweifach v. Scranton Lace Co., 156 F.Supp. 384, 393 (M.D.Pa. 1957); Qualley v. Snoqualmie Valley Bank, *supra*.

██ ██ Applying these principles to the facts in the present case, it is clear that a pledge was not created as of the date the sale was transacted. Although the parties intended to provide a security interest for Mrs. Groff, it was their further intent that such security interest would not be capable of attaching until the event of an uncured default in

AFL's payments. The execution of the escrow agreement and deposit of the stock certificates with the escrow agent was intended to provide for neutral custody of the stock pending such payments or default. Because there was no uncured default until January 7, 1971, Mrs. Groff's security interest was not capable of attaching until that date. The petition for reorganization and appointment of the Trustee having occurred more than six months earlier when Mrs. Groff did not possess a perfected security interest, she does not have a claim to the stock superior to that of the Trustee. The Referee's order is reversed.

It is so ordered.