**In the Matter of Lammot duPont COPELAND, Jr., Debtor.**

**No. BK 70–94.**

United States District Court,
D. Delaware.

Feb. 3, 1975.

See also D.C., 391 F.Supp. 134.

E. Norman Veasey, Martin I. Lubaroff, and Richard G. Elliott, Jr., Richards, Layton & Finger, Wilmington, Del., for the debtor.

Howard L. Williams, and Eduard F. von Wettberg, III, Morris, James, Hitchens & Williams, Wilmington, Del., for the Creditors' Committee.

Joseph Donald Craven, F. Alton Tybout, Tybout, Redfearn & Schnee, Wilmington, Del., for Pension Benefit.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This opinion treats the scope of summary jurisdiction in a Chapter XI proceeding under the Bankruptcy Act and the meaning of the term "bailee" as used in section 9–305 of the Uniform Commercial Code.

On July 3, 1967, Lammot duPont Copeland, Jr. ("Copeland") personally guaranteed a $2,700,000 loan made by Pension Benefit Fund, Inc. ("Pension Benefit") to Graphic Production Company and The Citizen-News Company ("corporations"). Nine days later, Copeland entered into an agreement with Pension Benefit whereby 18,187 shares of Christiana Securities Company ("Christiana") stock were posted as collateral security for his guarantee. On the same day, an escrow agreement was executed between Copeland, Pension Benefit and the Wilmington Trust Company ("WTC"). WTC was therein designated escrow agent to hold the Christiana stock. In the Spring of 1970 the corporations defaulted in making payment on the loan. On July 28, 1970, Pension Benefit made written demand upon the corporations, with copy allegedly sent to Copeland, for payment and advised legal action would be taken if payment were not forthcoming. On September 11, 1970, Pension Benefit sent a letter to Copeland and another to WTC demanding surrender of the escrowed Christiana stock.

On October 20, 1970, Copeland filed a Petition for an Arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., and was thereafter appointed Debtor-in-Possession ("debtor"). Bankruptcy Act § 342, 11 U.S.C. § 742.

In December 1970 the escrow agent, upon further demand, delivered the Christiana stock to Pension Benefit.

On October 19, 1973, the debtor and the creditors' committee jointly and severally filed with the Referee a Turnover Application seeking an order directing

Pension Benefit to surrender to the debtor all the Christiana stock and all dividends received by Pension Benefit with respect to the Christiana stock on the ground that on October 20, 1970 Pension Benefit had neither an attached nor perfected security interest in the Christiana stock. The Referee, on October 23, 1973, issued an order directed to Pension Benefit to show cause why the relief requested should not be granted. In response thereto, Pension Benefit filed with the Bankruptcy Court a Motion to Dismiss the Turnover Application on the ground that the Referee lacked jurisdiction over the subject matter, and on other grounds. Pension Benefit's Motion to Dismiss was joined with the debtor and creditors' committee's Turnover Application. Together they constitute the subject of this opinion.

A preliminary question has arisen as to the status of the record because a portion of it is before another judge of this Court in a related proceeding. A court may not simply travel outside a record in order to notice the record in other proceedings; rather, the record in the other proceedings must be introduced into evidence. Funk v. Commissioner, 163 F.2d 796, 800–802 (3d Cir. 1947). *See also,* IX Wigmore on Evidence, § 2579 (3d ed. 1940) [hereinafter cited as Wigmore] ; 29 Am.Jur.2d Evidence § 58 (1967). However, if the record is from a prior stage in the same controversy or is part of the record in the same proceedings, a court, in its discretion may take judicial notice of the record. Young v. First National Bank, 85 F.Supp. 68 (N.D.Ill.1949) ; Frank v. Wilson and Company, 27 Del.Ch. 292, 32 A.2d 277 (Del.Sup.Ct.1943) ; *cf.* Wilmington Parking Authority v. Burton, 39 Del.Ch. 10, 157 A.2d 894 (Del.Sup. Ct.1960), rev'd on other grounds, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). *See also,* IX Wigmore, supra, § 2579, page 570 ; 29 Am.Jur.2d Evidence § 59 (1967). In the instant case the entire record is in this Court but before different judges. This Court exercises its discretion and takes judicial notice of the entire record in the District Court.

An issue raised by the Pension Benefit Motion to Dismiss the Application for Turnover Order is whether the scope of summary jurisdiction in a Chapter XI proceeding is broader than that which obtains in ordinary bankruptcy. The Debtor-in-Possession, relying upon section 311 of the Bankruptcy Act, 11 U.S.C. § 711,[1] asserts a bankruptcy court has summary jurisdiction over all property to which the Debtor-in-Possession has title, irrespective of who has possession. The creditor, Pension Benefit, contends ownership is unimportant and summary jurisdiction over the controversy is lacking because a third party had possession of the property and Pension Benefit had a substantial adverse claim to the Christiana stock.[2]

The positions of both litigants enjoy the support of respectable treatise authority.[3] 8 Collier on Bankruptcy ¶ 3.02 (14th ed. 1975) [hereinafter cited as *Collier*] views section 311 of the Bankruptcy Act, 11 U.S.C. § 711, as increasing summary jurisdiction in Chapter XI proceedings so as to base it upon all the bankrupt's property, regardless of who holds possession. On the other hand, 9 H. Remington, Bankruptcy § 3574 (6th ed. 1955) espousing a different view would apply the same criteria

---

1. Section 311 of the Bankruptcy Act provides :

 "Sec. 311. Where not inconsistent with the provisions of this chapter, the court in which the petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and his property, wherever located."

2. *See* Katchen v. Landy, 382 U.S. 323, 327, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

3. *See* Note, Summary Jurisdiction Under Chapter XI of the Bankruptcy Act : Collier v. Remington, 59 Geo.L.J. 1395 (1971).

for determining summary jurisdiction in Chapter XI as in straight bankruptcy:

"It is well settled that jurisdiction of a bankruptcy court in ordinary bankruptcy proceedings does not extend to property which, although asserted by some of those in interest to belong to the bankrupt and his estate, is, at time of institution of the proceedings, in possession of one claiming it adversely. This principle seems now to apply with full force to arrangement proceedings under Chapter XI . . . ."

The conflict has been expressly recognized though not necessarily resolved in the Ninth Circuit:

"In the instant case, appellant Receiver argues that in bankruptcy proceedings under Chapter XI the test of summary jurisdiction is debtor's ownership, not actual or constructive possession as in ordinary bankruptcy. In response to a similar claim, we said recently in Wikle v. Country Life Insurance Co., 423 F.2d 151, 153 (9th Cir. 1970):

'The two major bankruptcy treatises are in conflict on this point. Appellant relies on statements in 8 Collier on Bankruptcy, ¶ 3.02, pages 176–182, while appellees counter with a contrary view in 9 Remington on Bankruptcy, § 3573, pages 214–18 6th Ed. 1955. Although the matter is not free from doubt, case authority favors appellees' position. Sada Yoshinuma v. Oberdorfer Insurance Agency, 5 Cir., 136 F.2d 460, 461; Lockhart v. Garden City Bank and Trust Co., 2 Cir., 116 F.2d 658; In re California Paving Co., N.D.Cal., 95 F.Supp. 909.'

In Loyd v. Stewart and Nuss, Inc., 327 F.2d 642, 645 (9th Cir. 1964), and Pasadena Investment Company v. Weaver, 376 F.2d 175, 178 (9th Cir. 1967), however, this Court noted that 'Section 311 [11 U.S.C. § 711] confers

exclusive summary jurisdiction to determine controversies with respect to property owned by the debtor, *or* in the actual or constructive possession of the debtor or the Bankruptcy Court.'

"Despite this seeming disagreement, we are not required to reach this precise question in resolving this case." In re Barasch, 439 F.2d 1393, 1394–95 (9th Cir. 1971).

The same Circuit in a later opinion recognized the "disarray" of its decisions, but was seemingly tending toward enlarged Chapter XI summary jurisdiction:

"[2] As additional evidence that the Chapter XI jurisdiction was not intended to be restricted to a theory of possession, Section 314, 11 U.S.C. § 714 expressly gives the Bankruptcy Court authority to protect assets by injunction and to stay foreclosure proceedings—not just assets in the possession of the bankrupt.

"The cases in this circuit on the point appear to be in some disarray. Our most recent treatment of a Chapter XI proceeding discusses the problem but does not resolve it. Mithers v. Barasch, 439 F.2d 1393 (9th Cir. 1971)." In re Stockman Development Company, 447 F.2d 387, 390–91 (9th Cir. 1971).

The Second Circuit has approved the *Collier* approach of enlarged summary jurisdiction in Chapter XI.[4] Slenderella Systems of Berkeley v. Pacific Tel. & Tel. Co., 286 F.2d 488, 489–90 (2d Cir. 1961).

The Third Circuit, in In re Penn Central Transportation Company, 453 F.2d 520, 522 (3d Cir. 1972), interpreted language identical to section 311 of the Bankruptcy Act, 11 U.S.C. § 711, to wit, section 77 of the Bankruptcy Act, 11 U.S.C. § 205, in a manner consistent with the *Collier* interpretation. In In re Rubin, 378 F.2d 104 (3d Cir. 1967), the same Circuit embraced the concept of

4. *But cf.* World Scope Publishers, Inc. v. United States, 348 F.2d 640 (2d Cir. 1965).

enlarged summary jurisdiction based upon ownership.[5]

"[T]he question of summary jurisdiction will depend on whether the debtor had constructive possession of the routes at the time the petition was filed or anytime subsequent thereto. In the case of intangibles such as these routes, constructive possession usually follows ownership. In re Marsters, 101 F.2d 365 (C.A. 7, 1938), cert. denied sub nom. Herman v. Henley, 306 U.S. 663, 59 S.Ct. 788, 83 L. Ed. 1059 (1939) (and cases cited). Of course ownership can only be determined from an in-depth examination of the relationship, contractual and otherwise, between the 'driver-salesmen' and the debtor. If ownership is determined to reside in the debtor, the court will have summary jurisdiction as well as jurisdiction over the routes themselves since it has jurisdiction of the 'debtor[']s] * * * property, wherever located.' Bankruptcy Act, § 311, 11 U.S.C. § 711." *Id.* 378 F.2d at 109.

Adoption of Chapter XI Rule 11–44(a) [6] without any limitation based upon property in possession of the debtor is consistent with the enlarged concept of Chapter XI jurisdiction based upon the debtor's ownership of property as well as possession. Even stronger is the Advisory Committee's Note to Section 311 which, while not having the effect of law, unequivocally indicates that Committee had embraced the *Collier* position:

". . . § 311 gives the court exclusive jurisdiction of the debtor and its property wherever located and this jurisdictional grant includes granting stays and injunctions. See 8 Collier ¶ 3.02 (1963)." Collier, Bankruptcy Act and Rules 620.50 (Pamphlet ed. 1974).

■ Based upon all of the foregoing precedents, the Court adopts the *Collier* view that in Chapter XI proceedings, summary jurisdiction is enlarged and may, thus, in addition to all other existent bases of summary jurisdiction, be predicated solely upon ownership of property by the debtor.

■ Having adopted the *Collier* view, it is incumbent upon the Court to determine not only ownership of the Christiana stock but also whether there was an adverse claim of ownership in the Christiana stock at the time of the filing of the Chapter XI petition.[7] If an adverse claim to ownership does exist, it must then be determined whether it is substantial or merely colorable; "if found to be substantial the court must decline to determine the merits and must dismiss the summary proceeding, but if found to be merely colorable the court has jurisdiction to adjudicate the merits summarily." [8]

■ Pension Benefit's claim of ownership, if any, must be tested under state law [9] and can only be determined from an in-depth examination of the

---

5. *But cf.* In re Dolly Madison Industries, Inc., 504 F.2d 499 (3d Cir. 1974).

6. "(a) *Stay of actions and lien enforcement.* —A petition filed under Rule 11–6 or 11–7 shall operate as a stay of the commencement or the continuation of any court or other proceeding against the debtor, or the enforcement of any judgment against him, or of any act or the commencement or continuation of any court proceeding to enforce any lien against his property, or any court proceeding, except a case pending under Chapter X of the Act, for the purpose of the rehabilitation of the debtor or the liquidation of his estate."

The Order of the Supreme Court approving the Chapter XI Rules made the Chapter XI Rules applicable to proceedings pending on July 1, 1974 unless infeasible or unless an injustice would result.

7. In re Rubin, 378 F.2d 104, 109 (3d Cir. 1967); In re Brokol Manufacturing Company, 221 F.2d 640, 643 (3d Cir. 1955).

8. 8 Collier ¶ 3.02.

9. In re Barasch, 439 F.2d 1393, 1395 (9th Cir. 1971). A reading of the briefs of both litigants demonstrates they are in agreement that Delaware law is the controlling state law.

relationship [10] between the debtor and Pension Benefit.

The agreements entered into between the debtor and Pension Benefit in July 1967 were evidenced by three writings. The first dated July 3, 1967, is styled "Deed of Trust Note" and was executed by Graphic Production Corporation and The Citizen-News Company, made payable to Pension Benefit Fund, Inc. and guaranteed by Lammot duPont Copeland, Jr., the debtor.

The other two are each dated July 12, 1967 and are individually styled "Agreement." In the first (hereinafter cited as "Pledge Agreement"), between Copeland and Pension Benefit Fund, Inc., the former is referred to as "Pledgor" and the latter as "Pledgee." It states in part: "[T]o induce the Pledgee to make such loan, the Pledgor has agreed to pledge certain stock in escrow as security for the repayment of such loan." [11] Pertinent provisions of the Pledge Agreement are as follows:

"1. In consideration of the loan, the Pledgor has pledged as collateral security the stock listed on Exhibit III annexed hereto and executed stock powers sufficient to carry out this agreement, and delivered the same to The [sic] Wilmington Trust Company, all in accordance with the Escrow Agreement annexed hereto and incorporated herein by reference. (Exhibit IV)

"2. During the terms of this pledge, all dividends and other amounts received by the Pledgee as a result of his [sic] record ownership of the said stock, shall be forthwith paid over to the Pledgor.

"3. During the terms of this pledge, and so long as the Pledgor is not in default in the performance of any of the terms of this Agreement or in the payment of principal or interest of the said loan, the Pledgor shall have the right to vote the pledged stock on all corporate questions, and the Pledgee shall execute due and timely proxies in favor of the Pledgor to this end.

\* \* \* \* \* \*

"6. In the event that during the term of this pledge, subscription warrants or any other rights or options shall be issued in connection with the pledged stock and if the same be exercised by the Pledgor, all new stock or other securities so acquired by the Pledgor shall be immediately assigned to the Wilmington Trust Company to be held in the same manner as the shares of stock originally pledged hereunder.

"7. Upon payment of the said loan at maturity or at any other time when such payment may be made of the principal and appropriate interest to the date of such payment together with prepayment charges, if any, upon presentation of the cancelled note The [sic] Wilmington Trust Company shall return to the Pledgor all stock and stock powers held by it as security hereunder.

"8. In the event there is a default by the Pledgor in the performance of any of the terms of this Agreement, or if there is a default in the payment of the loan as provided in the note and if such default continues for a period of fifteen (15) days, ~~either~~ [sic] the Pledgee shall have the right, upon fifteen (15) days notice, sent by registered mail to the Pledgor, to call upon The [sic] Wilmington Trust Company to forthwith deliver all of the stock and stock powers which it is holding as security hereunder to Pledgee, or such other party as Pledgee may designate, and thereupon, without any liability for any dimunition [sic] in price which may have occurred, and without further consent by Pledgor, the said Pledgee may sell all or part of the said stock in such manner and for such price or prices as the said

---

10. In re Rubin, 378 F.2d 104, 109 (3d Cir. 1967).

11. The certain stock referred to is the 18,187 shares of common stock in Christiana Securities Company, the subject of this proceeding.

Pledgee may be able to obtain. At any bonafide [sic] public sale, the Pledgee shall be free to purchase all or any part of the pledged stock. Out of the proceeds of any sale, the Pledgee shall retain an amount equal to the entire unpaid principal and interest then due on the loan plus the amount of the actual expenses of the sale and shall pay the balance to the Pledgor. In the event that the proceeds of any sale are insufficient to cover the entire unpaid principal and interest of the loan plus the expenses of the sale, the Pledgor shall be liable for any deficiency. . . . "

The "Escrow Agreement" referred to in paragraph 1 and incorporated by reference into the Pledge Agreement is the second agreement entered into on July 12, 1967 [hereinafter cited as "Escrow Agreement"]. This agreement was executed by Copeland, The [sic] Wilmington Trust Company, and The [sic] Pension Benefit Fund, Inc. This agreement provided in pertinent part:

"1. The Pledgor hereby deposits with the Escrow Holder for safekeeping and subject to the terms and conditions of this Agreement and the Pledge Agreement the securities mentioned on Schedule A annexed hereto, together with stock powers sufficient to carry out the terms of this Agreement.

"2. The Escrow Holder hereby acknowledges receipt of the securities listed on Schedule A and the stock powers executed by the Pledgor sufficient to carry out the function of this Agreement and agrees to receive, hold and deliver them as required by and subject to, the terms of this Agreement.

"3. The deposit thus accomplished is made as a part of the security arrangement for the loan described in the Pledge Agreement and the stock described in Schedule A shall be returned to the Pledgor upon the repayment in full of the said loan and the submission to the Escrow Holder of

the cancelled note evidencing the same. This agreement may not otherwise be altered or terminated, except by the joint agreement of the Pledgor and the Pledgee and the Escrow Holder.

"4. During the term of this Agreement and while the Pledgor is not in default, the Pledgor shall continue to remain as the owner of record of the stock listed on Schedule A and shall in all respects continue to be the owner of said securities, including the right to receive current income and to vote the shares of stock, subject to this Agreement and the Pledge Agreement. . . . In the event during the term of this Agreement subscription warrants or any other rights or options shall be issued in connection with the pledged stock, and if the same are exercised by the Pledgor, new stock and other securities so acquired by the Pledgor shall immediately be delivered to the Escrow Holder with appropriate stock powers sufficient to carry out the terms of this Agreement and the same shall be held in the same manner as the shares of stock originally pledged under the Pledge Agreement.

"5. If at any time there shall be a default under the Pledge Agreement, the Escrow Holder shall, upon written notice from the Pledgee at the end of the time provided in the Pledge Agreement for the curing of such default, immediately turn over all of the securities and stock powers held hereunder to the Pledgee who will receive the same for such disposition as provided by the Pledge Agreement.

\* \* \* \* \* \*

"7. Return to the Pledgor of any securities held hereunder in accordance with the terms of the Pledge Agreement shall require the written direction to that effect of the Pledgee. . . . "

While paragraph 2 of the Pledge Agreement implies that Pension Benefit was to be record owner of the stock, the

parties have stipulated that at the time WTC transferred the stock to Pension Benefit, it also turned over stock powers signed in blank by the debtor for all of the Christiana stock. The stock powers were subsequently used by Pension Benefit to have the Christiana stock registered in the name of its nominee. This comports with paragraph 4 of the Escrow Agreement in which it is stated that so long as the debtor was not in default, he should continue to remain as the owner of record of the stock. Both agreements state that the pledgor should have the right to vote the pledged stock on all corporate questions, so long as he was not in default.

Both agreements state that all dividends and other amounts received by virtue of the stock were to be forthwith paid over to the debtor, except in the case of stock dividends which were to be held by the Escrow Holder under the terms of the agreement in the same manner as the original shares of stock pledged thereunder. It appears from answers to interrogatories that Pension Benefit did not receive any cash dividends until after the Chapter XI petition was filed, a result consistent with ownership in Copeland.

Both agreements state that on payment of the said loan at maturity, the stock should be returned to the debtor.

In the event of a default, the Pledge Agreement states that Pension Benefit would have the right to have such stock and stock powers delivered to it by WTC, following which Pension Benefit was then expressly empowered to sell all or part of such stock, the proceeds to be applied to the debt owed Pension Benefit. If there was a surplus, the balance was to be paid to the debtor. Finally, the Pledge Agreement states that if and when such a public sale ensued, Pension Benefit would be free to purchase all or any part of the stock. The provisions with respect to payment of a surplus on default and the right of Pension Benefit to purchase at public sale are also consistent with ownership in Copeland prior to such a sale.

■ Read together, the agreements clearly call for ownership to remain with the pledgor, at least "during the term of this Agreement and while the Pledgor is not in default. . . ." (Escrow Agreement ¶ 4.) No additional explicit reference to title is made as to events thereafter until in the Pledge Agreement reference is made to public sale by Pension Benefit at which time Pension Benefit would be free to buy any or all of said stock. The operative facts compel a finding of ownership in the debtor at the time of filing of the Chapter XI petition, even though there may have been a default by him at that time.

■ Moreover, if, as Pension Benefit contends, the agreements entered into constituted a security agreement in the nature of a pledge, then it is clear that pledgor retained title. For, under the law of pledge, a pledgor retains title even without possession prior to default. Indeed, title remains in the pledgor after default as well. The pledgee at that point has only the right to proceed by the terms of the contract and in concert with such rights and remedies as are provided by the Uniform Commercial Code. 68 Am.Jur.2d Secured Transactions § 62 (1973); 5A Del.C. § 9–501. "Since it makes no substantial difference under the Uniform Commercial Code whether the debtor or the secured party has legal title to the collateral, there is no automatic transfer of title merely by reason of the debtor's default." 68 Am.Jur.2d Secured Transactions § 200 (1973). These rules of common law pledge continue to take force under the Uniform Commercial Code. 5A Del.C. § 1–103. The Code itself does not determine whether title to collateral is in the secured party or in the debtor. "The location of title may become important for other purposes . . .. In this connection the use of a form which has traditionally been regarded as determinative of title . . . could reasonably be regarded as evidencing the parties' intention with respect to title to the collateral." ALI–NCCUSL Uniform

Commercial Code (Official Text and Comments ed. 1972) § 9–101 Comment.

As a result of the foregoing, the Court finds that ownership of the Christiana stock for purposes of summary jurisdiction was in the debtor at the time of the filing of the petition.[12] While Pension Benefit has asserted an adverse claim to the Christiana shares, it has asserted no adverse claim, substantial or colorable, to the ownership of the shares as of the date of the filing of the petition. Instead, it has taken the position that a valid pledge was created, which Pension Benefit concedes requires that ownership or title remained in the debtor.[13]

Having found ownership of the Christiana stock in the debtor and Pension Benefit asserting no adverse claim to ownership as of the date of the filing of the Chapter XI petition, it is held the Court has summary jurisdiction to determine the Turnover Application.[14] Attention is now turned to the merits of the Turnover Application.

Where, as here, no receiver or trustee has been appointed, the debtor-in-possession exercises all the powers of a trustee appointed under the Bankruptcy Act. Bankruptcy Act § 342, 11 U.S.C. § 742. The debtor-in-possession has, as of the date of the filing of the petition, the rights and powers of a "creditor who upon the date of bankruptcy obtained a lien by legal or equitable proceedings upon all property . . . ." Bankruptcy Act § 70(c), 11 U.S.C. § 110(c). If a transfer is valid against such a creditor, it is valid against the trustee. *Id.*

The validity of any transfer against such a creditor and, hence, a debtor-in-possession, must be determined by state law. Delaware, having adopted the Uniform Commercial Code, state law interacts with the Bankruptcy Act to produce this result: if a security interest is perfected prior to the time of filing of a petition in bankruptcy, then such interest is superior to that claimed by the debtor-in-possession. If no security interest exists or if a security interest exists but is not perfected on the date of filing of a petition, the debtor-in-possession has rights to the collateral superior to that of the secured party.[15]

A prerequisite to a security interest is a security agreement. Under 5A Del.C. § 9–105(1)(h) " 'Security

12. Pension Benefit cited In re American Southern Publishing Company, 426 F.2d 160 (5th Cir. 1970) and In re G. L. Odell Constr. Co., 119 F.Supp. 578 (D.Colo.1954) in support of its position that the Court does not have summary jurisdiction. Those cases were ordinary bankruptcy cases and thus necessarily failed to reach the question of whether the debtor's ownership of property constituted a basis for summary jurisdiction by reason of section 311, 11 U.S.C. § 711.

13. Pension Benefit Fund's brief in Support of its Motion to Dismiss and in Opposition to the Debtor's and Creditors' Committee's Application for a Turnover Order at 16, 18, 21, 23, 24, 25.

14. Having determined the Court has summary jurisdiction by reason of debtor's ownership of the Christiana stock, it is unnecessary to discuss the other bases of summary jurisdiction urged by debtor, namely, consent by reason of Pension Benefit's having filed a proof of claim, and jurisdiction resulting from debtor's theoretical constructive possession of the Christiana stock. However, on March 15, 1973, the then Referee in Bankruptcy held on alternative grounds that the Bankruptcy Court had summary jurisdiction to order an evaluation of the Christiana stock pursuant to section 57(h), 11 U.S.C. § 93(h). Nothing contained herein is intended to detract from the efficacy of that holding.

Following the filing of the Application for Turnover Order, the then Referee in Bankruptcy by letter dated March 4, 1974, invited discussion of the summary jurisdiction of the Court in the context of its jurisdiction to consider the turnover application.

"Among the issues which should be briefed is the summary jurisdiction of the Bankruptcy Court, notwithstanding the Court's language and conclusion contained in Pages 21–23 of its March 15, 1973, Opinion."

15. 5A Del.C. § 9–301(1)(b) states in pertinent part "[A]n unperfected security interest is subordinate to the rights of . . . a person who becomes a lien creditor without knowledge of the security interest and before it is perfected."

agreement' means an agreement which creates or provides for a security interest." 5A Del.C. § 1–201(37) defines " 'security interest' [as meaning] an interest in personal property or fixtures. which secures payment or performance of an obligation." Under 5A Del.C. § 1–201(3) an " 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this title." In the Pledge Agreement of July 12, 1967, the following language appears. "WHEREAS, to induce the Pledgee to make such loan, the Pledgor has agreed to pledge certain stock in escrow as security for the repayment of said loan." In an amendment to the Escrow Agreement dated November, 1967, the language begins "Heretofore, under date of July 12, 1967, the parties hereto entered into an Agreement . . . whereunder Escrow Holder received from Pledgor certain shares of stock to be held as security for a loan from Pledgee to nominee of Pledgor, . . ." Taken together these agreements, including the right of the pledgee to sell the stock upon default and use the proceeds in payment of the debt, constitute a security agreement for purposes of Article 9 of the Uniform Commercial Code, 5A Del. C. § 9–101 et seq. Nor do the parties dispute the existence of a security agreement.

Whether the security interest was perfected before the date of filing of the petition is a separate issue. "A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken." 5A Del.C. § 9–303(1).

 First to be considered is the attachment of the security interest. An interest becomes attached when property becomes subject to the security interest. A security interest in personal property attaches only when the parties agree that it shall attach.[16]

 Copeland asserts the parties agreed that Pension Benefit's security interest in the stock certificates would not attach until after (1) default had occurred; (2) the default continued for a 15 day period; (3) fifteen days' written notice by registered mail had been sent to Copeland by Pension Benefit; and (4) proper demand had been made upon WTC to deliver the certificates and stock powers and the stock and stock powers had been delivered to Pension Benefit. Whether or not these steps were intended as prerequisites to attachment or to perfection of an already attached security interest must be determined. If they relate to attachment, then it must be that the parties did not intend that a security interest enforceable by Pension Benefit against Copeland be created until such time as these conditions were satisfied. 5A Del.C. § 9–201. An unperfected security interest, once attached, will be enforceable as between the parties to the security agreement. *Id.*

The debtor cites two cases in support of its motion. In re Portland Newspaper Publishing Co., Inc., 3 UCC Rep. Serv. 194 (D.Or.1966), aff'd on other grounds, 271 F.Supp. 395 (D.Or.1967), 417 F.2d 1277 (9th Cir. 1969), contains facts sufficiently dissimilar so as to be of no aid. The other case, In re Dolly Madison Industries, Inc., 351 F.Supp. 1038 (E.D.Pa.1972), aff'd mem., 480 F. 2d 917 (3d Cir. 1973), contains a fact pattern similar to but distinguishable from the present matter. In *Dolly Madison* there was not present any purported pledge agreement. In addition, and unlike this case, in *Dolly Madison* the purchase agreement and escrow agreement provided that upon the uncured default in the buyer's payments and upon

---

16. "A security interest cannot attach until there is agreement . . . that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the [foregoing] have taken place unless explicit agreement postpones the time of attaching." 5A Del.C. § 9–204(1).

notice to the escrow holder to whom the stock certificates had been entrusted, the escrow holder was to:

> " 'deliver the certificates to seller, *whereupon* seller's rights and obligations in and to the shares represented by the certificates . . . shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code as in effect in the Commonwealth of Pennsylvania.' (emphasis added)" 351 F.Supp. at 1040.

The buyer filed a bankruptcy petition prior to any demand by the seller for delivery of the stock and prior to the due date of the final payment under the purchase agreement. Regarding the above quoted language as pivotal, the District Court held the purchase agreement and escrow agreement postponed the time when the security interest was to have attached by making attachment contingent upon default followed by notice to the escrow holder and actual receipt of the stock by the secured party. 351 F. Supp. at 1041.

■ The instant matter is significantly different from that presented in *Dolly Madison*. Specifically, there is no "whereupon" clause to suggest that the seller's status as a secured party did not ensue until such time as there was a default and subsequent physical delivery of the certificates. In the case at bar there is a "Pledge Agreement" that is studded with references to "pledge," "pledgor" and "pledgee." The language employed reflects that the security agreement was to be operative and valid upon the signing of the agreement and long before any default on the part of the pledgor. 5A Del.C. § 9–204(1).

■ "[W]ords must have one, and only one, true and correct meaning, . . . this . . . must be sought only by poring over the words within the four corners of the paper, . . . extrinsic evidence of intention will not be heard, . . . evidence of surrounding circumstances will be admissible only in cases of latent ambiguity." 3 Corbin on Contracts § 536 (1960). The absence of any latent ambiguity in the writing as to the intent of the parties to create a security interest and have it attach immediately prevents the Court from looking outside of the writings to any affidavits or other actions by any parties to the agreement which might shed light, however dim, upon the original intent of the parties to these agreements.

The Pledge and Escrow Agreements of July 12, 1967, evidence a clear intent to immediately create a security interest in the Christiana stock. The security interest of Pension Benefit attached with the signing of these agreements and the transferring of the stock certificates and powers to WTC.[17]

■ The date of perfection of the security interest presents a difficult and troublesome question. An attached security interest is perfected "when all of the applicable steps required for perfection have been taken." 5A Del.C. § 9–303(1). The Christiana stock is an "instrument" within the meaning of 5A Del.C. § 9–304(1).[18] 5A Del.C. § 9–304(1) provides in pertinent part that "A security interest in instruments . . . can be perfected only by the secured party's taking possession . . . ." Therefore, the existence of a perfected security interest in the Christiana stock by Pension Benefit nec-

---

17. The fact that debtor retained indicia of ownership including the right to vote and receive dividends is not inconsistent with this conclusion. *See* discussion p. 17 *supra*, and 5A Del.C. § 9–202.

18. 5A Del.C. § 9–105(1)(g) defines an instrument as a security as defined in 5A Del.C. § 8–102. 5A Del.C. § 8–102(1)(a) states "a 'security' is an instrument which

(i) is issued in bearer or registered form; and (ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and . . . (iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer."

essarily turns upon whether it had possession for the limited purpose of perfection under the Uniform Commercial Code.[19]

5A Del.C. § 9–305 is titled "When possession by secured party perfects security interest without filing" and provides in pertinent part:

"A security interest in . . . instruments . . . may be perfected by the secured party's taking possession of the collateral. If such collateral . . . is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back . . . ."

Meritorious arguments can be advanced in support of perfection having occurred during any one of three distinct and mutually exclusive time periods: (1) On or about July 12, 1967, the date of creation of the security interest (in which case Pension Benefit had a perfected security interest and the Application for Turnover Order should be denied), (2) after September 11, 1970, the date of letters sent to WTC and to Copeland demanding the stock, and prior to October 20, 1970, the date of the filing of the Chapter XI petition (in which case the merits of the Turnover Order could not be determined at this time because of the necessity of holding an evidentiary hearing to determine whether there was a voidable preference), and (3) after the filing of the Chapter XI petition on October 20, 1970 (in which case the debtor-in-possession would have a claim superior to that of Pension Benefit in the Christiana stock and the Turnover Application should be granted).

The theory underlying the position that perfection did not occur until some time after July 1967 is that mere execution of the agreements did not result in placing possession of the Christiana stock in Pension Benefit within the meaning of 5A Del.C. § 9–305.

It can be argued that a proper statutory interpretation of the terms of 5A Del.C. § 9–305 requires resort to the common law of pledge.[20] For this reason only, there follows below an in depth examination of the possession requirement of the common law of pledge [21] and its interrelationship with the concept of an escrow holder.

In a pledge, the pledgee's interest in a chattel is "created by a bailment for the purpose of securing the payment of a debt or the performance of some other duty." Restatement of Security § 1(1941). A pledge "is a kind of bailment and security." In re Rogers, 20 F.Supp. 120, 128 (D.W.Va.1937). "A pledge is a bailment of personal property to secure an obligation of the bailor." Brown on Personal Property §

---

19. The respective agreements were executed on July 12, 1967 while the effective date of the Uniform Commercial Code in Delaware was July 1, 1967.

20. The perfection-by-possession sections of Article 9 share a common heritage in the prior law of pledge. "Section 9–303 is in accord with the common law of pledge which requires a transfer of possession from the pledgor to the pledgee as a prerequisite to creation of a security interest." 5A Del.C. § 9–303 Comment (1). "With respect to instruments . . . taking possession is the only permissible method of perfection. This rule recognizes the general commercial practice of treating security interests in instruments as pledges." 5A Del.C. § 9–304 Comment (1). See also ALI–NCCUSL Uniform Commercial Code §§ 9–205 Comment 6, 9–302 Comment 2, 9–304 Comment 1, 9–305 Comments 1–3 (1972).

21. It would not be correct to state that merely using the term "pledge" in a security device in Delaware today warrants an invocation of the old common law of pledge *qua* pledge, without need to refer to the superseding provisions of the Delaware Commercial Code. "The Article on secured transactions is vast in its application and importance. It applies to all transactions in which the parties agree that personal property shall secure payment or performance of an obligation. . . . [T]he old forms of security may still be used so long as they comply with the provisions of Article 9. . . . " 5A Del.C. § 9–101 Comment.

128 (2d ed. 1955). Further, "It is axiomatic that a delivery of pledged property need not be made to the pledgee, but can be made to a third person." Williams v. Espey, 11 Utah 2d 317, 321, 358 P.2d 903, 905 (1961). " 'Where the pledgor and pledgee select a third person to hold the property pledged, for the purpose of the pledge, he is called the "pledgeholder." ' 49 Corpus Juris [Pledges], p. 896, § 4." In re Rogers, *supra*, 20 F.Supp. at 126–27. The pledge holder is the agent of the pledgee for purposes of possession.[22] However, as between the pledgor and the pledgee, the pledgee must maintain dominion and control over the property.[23] Thus the rule is that no pledge is created if the pledgor or his agent retains possession of the collateral.[24] The authors of the Uniform Commercial Code adopted these aspects of the prior law of pledge.[25]

■■ In July 1967, and hypothetically applying only precode law, WTC, because it was not under the dominion and control of Pension Benefit, could not be considered a pledge holder. It was an escrow holder.

" . . . An escrow is a deed, money or chattel delivered to a person, the holder, by another and which the holder contracts to retain until the happening or non-happening of an event; . . . . Because of the agreement, such persons do not respond to the will of either of the parties until the specified event or period of time. Before this, he has power to deal with the subject matter in accordance with the agreement of those for whom he holds it, and this power cannot be terminated without the consent of both. . . .

\* \* \* \* \* \*

" . . . If the event happens which is to complete the transaction, the escrow holder becomes the agent in possession of the property or the holder of the title for the new owner. If the event does not happen before the specified time, the escrow is ended and the holder becomes the agent for each party as to the property which each had deposited with him.

" . . . The escrow holder differs from an agent who is acting for two adversary parties dealing with each other with the consent of each, . . . In this situation, the common agent has a duty to act fairly towards each principal and his power to act can be terminated by either at any time, despite any contract with him by either principal or between the two principals. . . . The escrow holder is not like an agent of a partnership or of joint principals, since his power to act can not be terminated by either of the parties who created the escrow, in the absence of an agreement otherwise, and is not terminated by the death of either or both." Restatement (Second) of Agency § 14D (1958).

\* \* \* \* \* \*

" . . . Fundamental to the existence of an escrow is the transfer of the escrow instrument into the hands

---

22. "Although possession by the pledgee may be accomplished through the use of an agent, the pledgee must have absolute dominion and control over the property. Qualley v. Snoqualmie Valley Bank, 136 Wash. 42, 238 P. 915 (1925), *supra*; 72 C.J.S. Pledges § 19b(6); *see*, Uniform Commercial Code § 9–305 Comment 2." In re Dolly Madison Industries, Inc., 351 F.Supp. 1038, 1042 (E.D.Pa.1972), aff'd mem., 480 F.2d 917 (3d Cir. 1973). This statement is not repeated in the comments to the Delaware Commercial Code.

23. *See* n. 22 *supra*. *See also* In re Hudson River Navigation Corp., 57 F.2d 175 (2d Cir. 1932).

24. *See generally* 21 R.C.L. Pledge §§ 10–14 (1918).

25. "Possession may be by the secured party himself or by an agent on his behalf: it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party." ALI–NCCUSL Uniform Commercial Code § 9–305 Comment 2. This statement does not appear in the comments to the Delaware Commercial Code.

of a third party as depository. Prior to the happening of any of the conditions upon which the escrow agreement operates, the escrow agent is not empowered to act for either party. Although he may be an agent for one of the parties in other respects, with respect to the instrument in escrow his powers are solely limited to those stipulated in the escrow agreement. Zweifach v. Scranton Lace Co., 156 F. Supp. 384, 393 (M.D.Pa.1957); Qualley v. Snoqualmie Valley Bank, supra." In re Dolly Madison Industries, Inc., 351 F.Supp. 1038, 1042 (E.D.Pa.1972), aff'd mem., 480 F.2d 917 (3d Cir. 1973).

As an escrow holder, therefore, WTC could not also be pledgee's agent for possession such as to give the pledgee the requisite dominion and control over the collateral. Indeed where the subject matter of the two common law devices is one and the same, "[T]he simultaneous existence of an escrow and a pledge is a legal impossibility." Dolly Madison, supra, 351 F. Supp. at 1042. There being no perfected common law pledge, there was arguably no "taking possession" by Pension Benefit in July 1967, either directly or through an agent, under 5A Del.C. § 9–305.

A second, independent method of perfection, by giving notice to debtor's bailee, is provided in 5A Del.C. § 9–305. However, this, too, derives from the old law of pledge.

"Where a chattel is in the possession of a third person a pledge may be created by assent of the pledgor and notification by either pledgor or pledgee, to the third person, that the chattel has been pledged to the pledgee." Restatement of Security § 8 (1941).

"If the goods at the time the pledge transaction is agreed upon are in the possession of a third person as bailee, the requirement of delivery is satisfied by notification to the bailee to hold the goods in behalf of the creditor." Brown on Personal Property § 128 (2d ed. 1955) and supporting citations.

It can be argued that WTC fell within this common law rule and was a bailee with notice by virtue of its possessing Copeland's stock with full notice of Pension Benefit's interest.

The presence of this caveat in the common law of pledge appears at first blush to be anomalous. The sine qua non of a pledge was transfer of possession to the pledgee. One longstanding exception to this rule was described earlier: actual possession could be held by an agent of the pledgee. The further caveat set forth immediately above, wherein possession by pledgor's bailee would suffice if he had notice of the pledgee's interest, seemingly dilutes the unique feature of the pledge to the point of its disappearance. The explanation lies in the strong public policy which favored creation of the caveat: the encouragement of commerce. The logical inconsistency which it engendered was solved by means of a legal fiction: the pledgor's bailee became, upon notice, the pledgee's agent.

"While ordinarily an agency cannot be created without consent of the agent (Restatement of Agency § 15) it is not considered desirable to require the consent of the third person as a condition precedent to the creation of the pledge. The third person's duties are not altered in any material respect by the pledge. To make the third person's consent a test of the creation of the pledge would invest him with an arbitrary power of affecting the interests of the other parties. The third person of course may surrender the possession if he does not wish to be under any duty to the pledgee." Restatement of Security § 8 (1941).

The common law imposed an agency relationship between a bailee with notice and the pledgee. In so doing it preserved the fundamental characteristic of a pledge which required that possession be in the pledgee or his agent.

■ Applying the common law of pledge to this case, WTC could not have been a bailee with notice in July 1967 because its status as escrow holder pre-

cluded its being simultaneously an agent of the pledgee. *See* discussion pps. 147–149, *supra*. Pension Benefit cites several cases to refute this conclusion, but none are compelling.[26] Under a common law reading, therefore, Pension Benefit presumably could not be "deemed to have [had] possession" in July 1967 as required to perfect its interest under 5A Del.C. § 9–305.

The foregoing analysis is compelling because of its technical compliance with a literal reading of 5A Del.C. § 9–305, and its faithful adherence to certain subtleties of that section's common law heritage. But it contains several weaknesses which limit its persuasiveness:

(1) It frustrates the intent of Copeland and Pension Benefit to effectively collateralize, as against third party creditors, debtor's guarantee;

(2) It assumes wholesale importation of the law of pledge and its technical aspects of possession into the Code through 5A Del.C. § 9–305;

(3) It neglects the policy considerations underlying the possessory requirements in both the law of pledge and in the Code, and it fails to examine whether these considerations have been met in this case; and

(4) It unduly restricts the use of the escrow device, which is a practical and commonly used instrument in business affairs.

As to the parties' intent, there is no evidence in the record from which to conclude that Pension Benefit had, in effect, bargained for a security interest good against Copeland but not against later third party lien creditors or a debt-

or-in-possession in Chapter XI proceedings. Likewise, Copeland presumably had no such intent. Copeland's presumed intent in bargaining for the escrow arrangement was merely to protect himself from possible misconduct of the creditor with respect to the collateral prior to default. By far the more reasonable inference is that, by depositing the stock with WTC in July 1967, both parties intended the creation of a perfected security interest in favor of Pension Benefit.

■ As a general proposition, the old law of pledge with its attendant technicalities occupies no exalted position in the Delaware Commercial Code. 5A Del.C., Article 9 applies "to any transaction (*regardless of its form*) which is intended to create a security interest in personal property . . .."[27] By enacting Article 9 of the Uniform Commercial Code the Delaware legislature opted to replace "the pre-code piecemeal multi-statute treatment of secured transactions with a single comprehensive integrated statute which recognizes that all security devices have in common the purpose of giving to certain creditors definite rights in particular property of the debtor.[28]

The Uniform Commercial Code provides (with non-germane exceptions) only unitary filing and possession as the means of perfecting a security interest. It expressly recognizes that security interests in certain types of collateral cannot be perfected by possession [29] while other types of collateral including stock certificates are by custom, usage and accepted commercial practice uniquely suited to perfection by possession.[30]

---

26. Many of these were cases in which two or more parties were each judged to have perfected security interests in the same collateral, although possession was in only one creditor, who acted as agent for possession for the others. *See* In re Hudson River Navigation Corp., 57 F.2d 175 (2d Cir. 1932); Gins v. Mauser Plumbing Supply Co., 53 F.Supp. 151 (S.D.N.Y.1943); aff'd on these grounds, rev'd on other grounds, 148 F.2d 974 (2d Cir. 1945); Schram v. Sage, 46 F.Supp. 381 (E.D.Mich., 1942); *cf.* United States v. Lucas, 148 F.Supp. 768

(M.D.N.C.1957); In re Chapman, 5 UCC Rep.Serv. 649 (W.D.Mich.1968).

27. 5A Del.C. § 9–102(1), (emphasis added); *accord, Id.* § 9–102(2).

28. 5A Del.C. § 9–101 Comment.

29. 5A Del.C. § 9–305 Comment.

30. 5A Del.C. § 9–305 Delaware Study Comment states in part:
 "Section 9–305 permits a security interest to be perfected by transfer of possession only when the collateral is goods, instruments, documents or chattel paper."

The only factor which would prevent perfection of the security interest under 5A Del.C. § 9–305 as of the date of execution of the instruments and delivery of the stock is the conflict at common law between the status of WTC as an escrow holder and a status as agent in possession exclusively for the pledgee. Only when the limitations of common law pledge are engrafted upon 5A Del.C. § 9–305 does this conceptual difficulty appear. It has not been a barrier in other reported cases under the Uniform Commercial Code. Barney v. Rigby Loan & Investment Co., 344 F.Supp. 694 (D.Idaho 1972); In re Estate of Hinds, 10 Cal.App.3d 1021, 89 Cal.Rptr. 341, 8 UCC Rep.Serv. 3 (2d Dist. 1970). No authority has been found which holds that an escrow holder could not qualify as a section 9–305 bailee with notice.

Important policy considerations underlie the ancient requirement that to effect a pledge the pledgor must be dispossessed of the collateral.

> " 'One of the reasons, and probably the chief reason, for the alleged general rule that a deposit of the thing pledged is an indispensable attribute of a valid pledge, is that such a pledge is indispensable to prevent the possession by the pledgor of the thing pledged from giving to him a false credit, just as the failure to deliver personal property sold causes a false credit to the vendor and avoids the sale.' Pierce v. National Bank of Commerce (C.C.A.) 268 F. 487, 492." In re Rogers, *supra*, 20 F.Supp. at 128.

■ Likewise under the Code, a chief purpose of requiring possession of certain collateral is to provide notice to prospective third party creditors that the debtor no longer has unfettered use of the collateral.[31] Where, as here, physical possession of the stock certificates was voluntarily given up by Copeland and placed with WTC with the agreement and acquiescence of Pension Benefit, the effective notice to other potential creditors was precisely the same as if Pension Benefit had taken possession of the Christiana stock certificates, i. e., Copeland was without the certificates.

A result which would require importation of common law niceties into the Code provides a trap for the unwary and would be a corruption of the Code's controlling rule of construction that it "shall be liberally construed and applied to promote its underlying purposes and policies." 5A Del.C. § 1–102(1).

Among these underlying purposes are:

"(a) to simplify, clarify and modernize the law governing commercial transactions;

"(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." 5A Del.C. § 1–102(2).

■ Thus, for this Court "to hold that an escrow arrangement can never protect [a] creditor from [third party lienholders or the powers of a bankruptcy trustee or debtor-in-possession]" would be to elevate "technicality over substance and [negate] the reasonableness the Code hoped to impart to commercial practices." [32]

The facts in this case include an expressed intent to "pledge certain stock in escrow," the existence of simultaneously executed Pledge and Escrow Agreements, an effective attachment of the security interest at the time of its creation in July 1967, and the removal of the collateral from the physical control of the debtor and into the actual possession of WTC, thereby affording conventional notice to any unsuspecting third party creditor. On these facts it is held that, for the limited purpose of perfecting a security interest within the meaning of 5A Del.C. § 9–305, WTC had possession as a bailee with notice such that Pension Benefit is "deemed to have [had] possession" as of the July 1967

31. J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 23–10 (1972).

32. 5 Rutgers-Camden L.J. 336, 344 (1974).

**152**

date of execution of the agreements and delivery of the stock to WTC.

Other arguments were advanced by Pension Benefit to support this same conclusion. It was argued in briefs that the conditions written into the two agreements were met upon receipt by WTC of Pension Benefit's letter of demand of September 11, 1970, which had the alleged effect of converting WTC from an escrow holder to a bona fide agent for Pension Benefit. A parallel argument, based upon a different interpretation of the imposed conditions, can be made with respect to a point in time fifteen days after receipt by WTC of the September 11th letter. These points, along with certain procedural objections directed to the filing of the Application for Turnover Order, need not be determined.

## ORDER

The Motion of Pension Benefit to Dismiss the Turnover Application of Lammot duPont Copeland, Jr. and the Creditors' Committee is denied.

The Application of Lammot duPont Copeland, Jr. and the Creditors' Committee for a Turnover Order is denied.