**Winthrop J. ALLEGAERT, as Trustee in Bankruptcy of duPont Walston Incorporated, Plaintiff,**

v.

**CHEMICAL BANK, Defendant.**

**No. 74 Civ. 1516.**

United States District Court, E. D. New York.

July 12, 1978.

Hughes, Hubbard & Reed by James B. Kobak, Jr., New York City, for plaintiff.

Cravath, Swaine & Moore by James F. Gleason, Jr., New York City, for defendant.

### OPINION and ORDER

PLATT, District Judge.

Plaintiff has moved for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") granting summary judgment in his favor on counts 1 and 13 of the complaint predicating his motion "only on the preferential transfer allegations (in his complaint) and the terms of the Subordinated Loan Agreement."

Defendant has cross moved for an order pursuant to the same Rule granting it summary judgment on count 1 of the complaint on the ground that pursuant to Section

60(a)(2) of the Bankruptcy Act, 11 U.S.C. §§ 1 et seq., the transfer alleged in that count is deemed to have occurred more than four months prior to the filing of the petition in bankruptcy.

The Court has attempted to analyze plaintiff's statement of the material facts submitted pursuant to General Rule 9(g) of the Rules of this Court and the defendant's counter statement and has arrived at the following statements of undisputed facts herein:

On or about November 27, 1972, Walston & Company ("Walston"), predecessor of duPont Walston Incorporated, and Security National Bank ("SNB"), predecessor of defendant Chemical Bank, entered into a Subordinated Loan Agreement (the "Subordinated Loan Agreement") by which SNB loaned to Walston, and Walston agreed to repay, subject to the terms of the agreement, the sum of $5 million. The Subordinated Loan Agreement was approved by the New York Stock Exchange ("Exchange"). Under Rule 325, the Exchange required Walston to seek its approval of the terms before the loan proceeds could be counted in the "net capital" computation periodically prepared by brokerage firms.

Walston's obligation under the Subordinated Loan Agreement was evidenced by a Senior Subordinated Note which contained subordination provisions similar to those contained in the Subordinated Loan Agreement.

On or about July 2, 1973, Walston entered into a series of agreements constituting a "realignment" with duPont Glore Forgan Incorporated ("DGF"), at which time Walston changed its name to duPont Walston Incorporated (also "Walston").

At or about the time of the realignment, SNB required Walston to enter into a Pledge Agreement ("Pledge Agreement") and an Amendment and Agreement dated as of July 2, 1973 (the "Amendment") to the Subordinated Loan Agreement.

The final versions of the Amendment and the Pledge Agreement relied on by SNB were executed after the realignment.

In the realignment Walston received a subordinated debenture of DGF in the principal amount of $5,733,333 (the "DGF Debenture") which represented part of Walston's investment in DGF.

The DGF Debenture was delivered to SNB at or about the time of the realignment pursuant to the Pledge Agreement.

At or about the time of the realignment, a Pledge Agreement was also made with the Bank of America National Trust and Savings Association ("BOA") which had also entered into a Subordinated Loan Agreement with Walston. BOA also came into possession of a DGF Subordinated Debenture (the "BOA DGF Debenture") in the face amount of $2,866,667.

In January, 1974, Walston requested and DGF made prepayments totaling $3.5 million to Walston on the DGF Debenture thus reducing the outstanding amount of the Debenture to $2,233,333.

On or about February 26, 1974, Walston commenced an action in the New York State Supreme Court, New York County, the complaint for which had been drafted in mid-February.

On the evening of March 26, 1974, the day before the filing of the petition initiating Walston's bankruptcy proceeding, a series of transactions was consummated.

In connection therewith, Walston requested and DGF agreed, with Exchange approval, to pay the remaining $2,233,333 on the DGF Debenture. Walston requested that the payment be made to SNB rather than to Walston. SNB received a check for $2,233,333 on March 26 and SNB consented that the money so received be applied to the reduction of Walston's Senior Subordinated Note.

Walston also requested that a payment of $366,667 be paid to SNB by BOA. SNB received a check from BOA for this amount on March 26, 1974 "for the account of Walston" and applied it, with Walston's consent, to the reduction of Walston's Senior Subordinated Note.

On March 27, 1974, Walston filed a petition for an arrangement under the Bankruptcy Act stating that it was insolvent.

Plaintiff's motion for summary judgment challenges both these transfers as voidable preferences.

Defendant's cross-motion for summary judgment asks this Court to decide that the first transfer discussed above from DGF to SNB in fact occurred more than four months prior to the filing of the petition in bankruptcy pursuant to Section 60(a)(2) of the Bankruptcy Act and therefore to dismiss count 1 of plaintiff's complaint.

The defendant also maintains that the following issues are among those which preclude entry of summary judgment for plaintiff at this time:

I: whether the transfer from DGF to SNB occurred for the purpose of Section 60 of the Bankruptcy Act on March 26, 1977;

II: whether Walston was insolvent at the time the alleged voidable preferences took place, and whether SNB had reasonable cause to believe that Walston was insolvent; and

III: whether the payment by DGF to SNB was a transfer of Walston's and not DGF's property, whether the payment was for Walston's and not for DGF's benefit, whether the payment was in payment of Walston's debt and not in settlement of the claims against DGF, whether the payment by BOA to SNB was a transfer of Walston's and not BOA's property, and whether the payment was in payment of Walston's debt and not for some other purpose.

Section 60 of the Bankruptcy Act provides in pertinent part as follows:

"§ 60. *Preferred Creditors.* (a)(1) A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the affect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

 * * * * * *

"(b) Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. . . ." 11 U.S.C. § 96 (1970).

Defendant correctly points out that to prevail the plaintiff must prove seven separate elements, viz.:

"Briefly stated the elements of a preference . . . consist of the following: a debtor

(1) making or suffering a transfer of his property,

(2) to or for the benefit of a creditor,'

(3) for or on account of an antecedent debt [resulting in a depletion of the estate],

(4) while insolvent, and

(5) within four months of bankruptcy . . . [and]

(6) the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class . . . . [and the element that]

(7) the creditor receiving or to be benefited by the preference had reasonable cause to believe that the debtor was insolvent." Collier Bankruptcy ¶ 60.02 (14th ed. 1976).

### I

The key issue raised by the defendant in opposing plaintiff's summary judgment motion herein is based on its theory that the "transfer" within the meaning of Section 60 of the Bankruptcy Act took place not on March 26, 1974 and thus well "within four months of bankruptcy" when payment was made, but rather "as of" July 2, 1973 and thus nine months before bankruptcy when SNB took possession of the DGF Debenture.

While the Trustee argues the transfer was made on March 26, 1974, the day before

the filing of the bankruptcy petition, defendant SNB argues that under Section 60(a)(2) of the Bankruptcy Act, the operative date of transfer "relates back" to the time at which a security interest was "so perfected" that the holder of the security interest would have priority over a hypothetical judgment lien creditor as to the particular asset in question. In the instant case, SNB argues that its security interest was "so perfected" on July 2, 1973 when it took possession of the DGF Debenture pursuant to the Pledge Agreement.

As to this argument, the parties are in sharp disagreement as to whether the DGF Debenture was the type of collateral as to which a security interest could be perfected by possession and even if it were whether a security interest "attached" or became effective before March 26, 1974.[1]

Leaving aside these questions, it seems clear to this Court that the parties in the case at bar agreed to postpone the time any security interest attached until an event of default had occurred and hence SNB had no security interest in the DGF Debenture until that time under applicable New York law.

In this regard, paragraph 2 of the Pledge Agreement between the parties provides in pertinent part as follows:

"(A) Unless and until an Event of Default (as defined in the Loan Agreement) shall have occurred and be continuing [Walston] shall be entitled to receive any interest or payments of principal on the DGF Debenture;

"(B) If any Event of Default shall have occurred and while the same is continuing interest and principal paid upon or in respect of the DGF Debenture or any part thereof shall be paid directly to and, shall be retained by [SNB] and held

---

1. Plaintiff also argues that the July 5, 1973 Pledge Agreement did not constitute a valid pledge such as to give SNB an enforceable security interest on that date. In making this argument, plaintiff relies on the Second Circuit's decision in *Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548 (2d Cir. 1976). In *Miller*, the Second Circuit held that (540 F.2d at 561):

"The elements of a pledge include an intention to pledge collateral security and possession of the collateral security by the pledgee . . . . ."

and that (540 F.2d at 561–62):

"To effect a valid pledge of an intangible asset . . . the pledgee . . . must possess formal written evidence of an interest in the intangible which so represents the intangible that the *enjoyment, transfer or enforcement* of the intangible depends upon possession of the instrument. Restatement of Security, *supra*, § 1, comment e. A valid pledge of such an 'indispensable instrument' creates an interest not only in the instrument but in the intangible represented by it. *Id.* § 2(3). However, where the instrument delivered to the putative pledgee is not indispensable to the transfer or enforcement of the intangible, the interest obtained cannot be a pledge. *Id.* § 1, comment e.

"While the district court held that the April 30 and May 2, 1973, correspondence between AIBC and appellant indicate a clear intention to pledge the Swiss Franc time deposit to the New York Bank, *see* note 6 *supra*, it concluded that the 'issuance by the Luxembourg bank to AIBC of a clean receipt for the time deposit, and the failure of the New York

bank to have the receipt recalled or modified to reflect its pledge, are . . . fatal to the [appellant] Bank's pledge claim.' 406 F.Supp. [452] at 468–69. Since a valid pledge could be created only by way of delivery of an indispensable instrument pertaining to the bank account itself, Restatement of Security, *supra*, § 1, comment e; G. Gilmore, Security Interests in Personal Property § 7.1 (1965); 21 Harv.L.Rev. 61, 61–62 (1907), and because there was no such delivery of any indispensable instrument to the New York Bank, the district court held that the claim of pledge must fail." (Emphasis added.)

In its analysis in *Miller*, however, the Second Circuit explicitly noted that the transaction in question was not covered by the New York Uniform Commercial Code ("N.Y. UCC") and that its decision rested on general principles of the common law of pledges and security interests. The transaction in the instant case, however, *is* governed by the N.Y. UCC, involving, as it does, the pledge of a financial instrument covered by Article 9. This statute supersedes the common law principles enunciated in *Miller* and provides the parties to the agreement and potential creditors with much more specific statutory safeguards. Given such coverage, while the instant pledge, in reserving to Walston the right to receive payments under the pledged debenture, *might appear analogous to* the ineffective pledge in *Miller*, the effects and consequences of the transaction must be judged by the applicable sections of the N.Y. UCC.

by it pursuant to the rights and remedies of a secured party under the Uniform Commercial Code as in effect at the time in New York."

As is clear from the above, the parties have agreed that the New York Uniform Commercial Code ("N.Y. UCC") should apply in determining the evidence and nature of any security interest in the DGF Debenture. Section 9–204(1) of the N.Y. UCC provides in pertinent part that:

"A security interest cannot attach until there is agreement (subsection (3) of Section 1–201) that it attach and value is given and the debtor has rights in the collateral. It attache[d] as soon as all of the events in the preceding sentence have taken place *unless explicit agreement postpones the time of attaching.*" (Emphasis added.)

The Court thus concludes that SNB's security interest in the DGF Debenture was unperfected until March 26, 1974 because by agreement between the parties, it did not attach on July 3, 1973, and did not attach until March 26, 1974, the day before Walston's petition under the Bankruptcy Act was filed.

There are two recent federal cases on this question, both decided by the Court of Appeals for the Third Circuit. *In re Dolly Madison Industries, Inc.*, 351 F.Supp. 1038 (E.D.Pa.1972), *aff'd mem* 480 F.2d 917 (3d Cir. 1973), and *In the Matter of Copeland*, 531 F.2d 1195 (3d Cir. 1976).

The *Dolly Madison* case "involved a sale of stock which was accomplished by means of the simultaneous execution of a purchase agreement, promissory note and escrow agreement. In order to secure payment of the purchase price of the stock, the purchase agreement created a security interest in the stock which was placed by the purchaser in escrow". *In the Matter of Copeland*, 531 F.2d at p. 1201. The purchase agreement provided in pertinent part that:

"In the event that AFL shall be in default in the payment of principal or interest under its promissory note . . and if said default shall not be cured within five days after receipt by AFL of notice thereof from seller, then the escrow agent, upon notice thereof from seller, shall deliver the certificates to seller, *whereupon seller's rights and obligations in and to the shares represented by the certificates . . . shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code as in effect in the Commonwealth of Pennsylvania.*" In *Re Dolly Madison Industries, Inc.*, 351 F.Supp. at p. 1040. (Emphasis added.)

The *Copeland* case involved the pledge of stock pursuant to an agreement which provided in pertinent part that (531 F.2d at pp. 1200, 1201):

"8. In the event there is a default by the Pledgor in the performance of any of the terms of this Agreement, or if there is a default in the payment of the loan as provided in the note and if such default continues for a period of fifteen (15) days, the Pledgee shall have the right, upon fifteen (15) days notice, sent by registered mail to the Pledgor, to call upon The Wilmington Trust Company to forthwith deliver all the stock and stock powers which it is holding as security hereunder to Pledgee, or such other party as Pledgee may designate, and thereupon, without any liability for any diminution in price which may have occurred, and without further consent by the Pledgor, the said Pledgee may sell all or part of the said stock in such manner and for such price or prices as the said Pledgee may be able to obtain. At any bona fide public sale, the Pledgee shall be free to purchase all or any part of the pledged stock. Out of the proceeds of any sale, the Pledgee shall retain an amount equal to the entire unpaid principal and interest then due on the loan plus the amount of the actual expenses of the sale and shall pay the balance to the Pledgor. In the event that the proceeds of any sale are insufficient to cover the entire unpaid principal and interest of the loan plus the expenses of the sale, the Pledgor shall be liable for any deficiency."

In the *Copeland* case, the Court of Appeals, in holding that the parties intended the security interest to become effective immediately, distinguished the *Dolly Madison* case, which held that the parties manifested an intention to delay attachment of the security interest, as follows (531 F.2d at p. 1202):

"Copeland contends that the purchase agreement in *Dolly Madison* is the 'functional, factual and legal equivalent' of paragraph 8 of the pledge agreement in the instant case. Both provide, he asserts, that upon an uncured default and appropriate notice and demand, the stock is to be delivered to the secured creditor. In seeking to analogize the agreement in *Dolly Madison* to the one in the case before us, the debtor ignores the obvious differences between the two provisions. The security agreement in *Dolly Madison,* unlike the agreement in the instant case, specifically provides that in the event of default, notice, and delivery of the stock to the creditor, 'the seller's rights and obligations in and to the shares represented by the certificates . . . shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code . . .' By necessary implication, the seller achieves the status of a secured party with a perfected security interest only after default and the fulfillment of the other preconditions specified in the purchase agreement.

"In contrast to the language of that agreement, paragraph 8 of the pledge agreement in the case *sub judice* neither explicitly nor implicitly postpones the attachment or perfection of the security interest. Rather, it is completely silent as to the time at which Pension Benefit achieves the status of a secured creditor with a perfected security interest."

The language of the Pledge Agreement before the Court in the instant case lies in between the extremes of the *Dolly Madison* and *Copeland* cases discussed above. While paragraph 2 of the Pledge Agreement does not condition the attachment of SNB's security interest in the DGF Debenture so

explicitly upon a default as did the corresponding language in the *Dolly Madison* case, it does indicate that SNB is to obtain the "rights and remedies of a secured party under the Uniform Commercial Code" *only* as to interest and principal *paid to it after the event of a continuing default.*

SNB's response to the above conclusion would appear to be that paragraph 1 of the Pledge Agreement quite clearly contradicts plaintiff's argument as to delayed attachment by providing that

"BORROWER has pledged with the BANK as pledgee under the provisions of this Agreement and does hereby grant the Bank a security interest in the senior subordinated debentures . . ."

This language does appear to contradict that of paragraph 2 and thus the Court is faced with an apparent ambiguity in contractual language which it must resolve.

Resolution of this apparent ambiguity lies in the Amendment entered into simultaneously with the Pledge Agreement that added paragraph 8 to the Subordinated Loan Agreement which provides in pertinent part that:

"BORROWER and BANK have entered into as of July 2, 1973, a Pledge Agreement . . . and the provisions of Paragraph 3 hereof shall be construed consistently therewith."

Paragraph 3.1(a) of the Loan Agreement, in turn, further provides, in pertinent part, that:

"The right of BANK as holder of the note . . . to receive payment of each instalment of principal and interest . . . [A] shall be irrevocably subordinate in right of payment and subject to the prior payment or provision for payment in full of all Senior Claims of other present and future creditors of BORROWER and [B] in the event of the appointment of a receiver or trustee or insolvency of BORROWER . . . its liquidation . . . its bankruptcy, assignment for the benefit of creditors, reorganization . . . or any other marshalling of the assets and liabilities of

BORROWER . . ., the holder of the Note shall not be entitled on account of such Subordinated Instalment to participate or share ratably or otherwise in the distribution of assets of BORROWER until all Senior Claims shall have been satisfied. . . ."

Paragraph 3.2 further provides that:

"BANK agrees that it is not taking and will not take or assert as security for the payment of the Note or the payment of interest thereon any security interest in or lien upon, whether created by contract, statute or otherwise, any property of BORROWER or any property in which BORROWER may have an interest, which is or at any time may be in the possession or subject to the control of BANK."

Thus, the parties agreed that the Pledge Agreement be interpreted consistently with the subordination clause in the original Subordinated Loan Agreement.[2] In light of this agreement, the Court decides that the apparent contractual ambiguity in the Pledge Agreement as to the time of attachment of SNB's security interest yields to the conclusion that this security interest was intended to attach, by agreement, as to interest and principal paid SNB upon the event of a continuing default. In this case, such attachment occurred on March 26, 1974, well within the four month period preceding bankruptcy.

In addition to the intent inferred from the foregoing language of the instruments in question, the plaintiff has also produced substantial extrinsic evidence which supports the conclusion that the parties did not intend to create a security interest which attached or became effective immediately.

Under the foregoing paragraph 2(A) of the Pledge Agreement and the terms of the DGF Debenture, Walston on January 19, 22 and 31, 1974, obtained from DGF a total of $3.5 million in Exchange-approved payments on the Subordinated DGF Debenture then in the possession of SNB. These payments reduced the principal amount of the DGF Debenture to $2,233,333. Indeed, from all that appears in the Pledge Agreement and the Debenture itself, there was nothing to prevent Walston from obtaining full repayment of the principal without the knowledge or consent of SNB, the alleged pledgee, absent the occurrence of an event of default.

While apparently Mr. Bagg of SNB "expressed . . . displeasure" over these payments of principal when he first learned of them on February 8, nevertheless there was little, if anything, SNB or he could do about the same in view of the explicit provisions in the Debenture and Pledge Agreements authorizing them.

The evidence also rather conclusively shows that the officers of the SNB understood that attachment would be delayed until the occurrence of an event of default because they held the debenture in a desk drawer of one of the Bank's officers, rather than in a bank vault where collateral ordi-

---

**2.** Defendant argues that plaintiff's interpretation of the subordination clause strains credulity in that it apparently defers SNB's entitlement to repayment on the subordinated loan until all Senior Claims are paid off in full, an unrealistic eventuality, and that it is arguably contradicted by the terms of paragraph 3.1(e) of the Subordinated Loan Agreement itself.

This Court does not agree with the construction of the subordination clause by either plaintiff or SNB and feels that the proper construction of this clause avoids the seemingly inconsistent results posed above. Specifically, this Court feels that the subordination clause is complete by its terms as to all Senior Claims. However, such claims, by definition, are only those claims which matured before the subordinated loan itself matured; i. e., before, accord-

ing to the terms of the Subordinated Loan Agreement, SNB was to receive the first payment on its subordinated loan, whether or not such payment was at that time made or could at that time be legally made under the Subordinated Loan Agreement.

This interpretation then, comports with the conclusion reached by the Court as to the deferment of the attachment of a security interest pursuant to the Pledge Agreement. Thus, on the occasion of a continuing default and necessarily after all Senior Claimants had had an opportunity to secure their interests, SNB could secure its interests by receiving payment on the DGF Debenture and holding such proceeds as a secured party pursuant to the Pledge Agreement.

narily was kept, and wrote an auditor's confirmation letter dated December 7, 1973, to Walston asking the latter to confirm that there was outstanding a $5 million subordinated loan having no collateral. It was not until February of 1974, when SNB had decided to sue Walston, that the DGF Debenture was transmitted to its vault with a description of the same as "side collateral" and "new". Mr. Bagg has testified that the term 'side collateral' "is used to refer to collateral securities or other property which is held by the Bank, although not specifically pledged, to support a given loan."

The factual evidence as to the parties' intent thus supports this Court's legal conclusion as to the same based on the documents themselves. As indicated, in this Court's view the only way that these two agreements can be construed "consistently" with one another is by construing the Pledge Agreement to provide that attachment would be deferred until an event of default had occurred. Such being the case, it is clear that there was no transfer within the meaning of Section 60 of the Bankruptcy Act until March 26, 1974.[3]

Accordingly, this Court holds that the transfer alleged in count 1 of plaintiff's complaint did not, as defendant contends, occur on July 2, 1973, but rather occurred on March 26, 1974, well within the four months prior to the filing of the petition in bankruptcy, and hence defendant's cross motion for summary judgment must be, and the same hereby is, denied.

## II

The next questions raised by the defendant are whether Walston was insolvent at the time the alleged voidable preference took place, and whether SNB had reasonable cause to believe that Walston was insolvent.

In this regard, on the morning after the transfer in question, i. e., on March 27, 1974, Walston filed its Chapter XI petition in the Bankruptcy Court alleging that it was "insolvent" and attached schedules demonstrating insolvency as of March 22, 1974. More than $90 million of claims—of which over $80 million were claims senior to SNB's—were timely filed in Walston's bankruptcy against and estate which to date totals only $3.4 million. In the schedules themselves, Walston alleged that it had $44 million in liabilities and less than $41 million in assets, many of which were substantially worthless. In the light of all of the undisputed facts adduced by the plaintiff on this issue, there is no merit to defendant's claim that there is a question of fact with respect to the actual insolvency of Walston on March 26, 1974.

With respect to the question of whether SNB had reasonable cause to believe that Walston's property had fair market value on March 26, 1974, which was less than sufficient to pay all its debts, the following facts appear to be indisputable:

During the period from December 1972 to June 1973, Walston experienced losses averaging $845,000 per month or a total of almost six million dollars and in the next four months losses averaged over $3.6 million dollars per month or an additional fourteen and a half million dollars. At this juncture Mr. Harvey M. Bagg, Jr., an Assistant Vice President in SNB's National Division, prepared an analysis of Walston's financial condition which showed that as of October 31, 1973, even if many of Walston's claimed assets, which were in fact by Mr.

---

**3.** In light of what has been said herein it might be argued that defendant's security interest attached not on March 26, 1974, when it was actually paid interest and principal from the DGF Debenture, but rather at the moment of an event of default which triggers the right to said payment. Even if the transfer were to be dated, for the purposes of the Bankruptcy Act, as of the event of a claimed default, the result reached here would not be affected since, by defendant's own admission, the earliest an alleged default occurred was in January, 1974, less than four months prior to the filing of the petition in bankruptcy. *See Defendant's Memorandum in Opposition*, fn. at p. 53. Nevertheless, this Court reiterates that it concludes that, by the terms of the Pledge Agreement, SNB's security interest was to attach *only* as to interest and principal *paid to SNB* on the DGF Debenture and that such attachment occurred on March 26, 1974 when the transfer in question was made.

Bagg's own admission "illusory," were assigned full value, Walston was insolvent in that only $7,615,000 was available for subordinated lenders claims of $29,129,000. At that point SNB's and BOA's subordinated loans aggregated $7.5 million dollars which left virtually nothing to cover the remaining subordinated claims in excess of $20 million dollars.

In SNB's continuing history sheet of the loan on January 11, 1974, Mr. Bagg noted, "At the present rate of loss, an estimated $2MM per month, the subject could be expected to survive for 5–6 months at the most" and that Walston was at that time contemplating "orderly liquidation."

In mid-January, SNB received financials showing that Walston had after-tax losses for November, 1973, of $8,569,000, and Mr. Bagg accordingly concluded that as of November 30, 1973 only $3,231,000 would have been available to cover all of the subordinated loans. Among the covering assets were some $4,697,000 described as "Other Assets".

Mr. Milton F. Gidge, Senior Vice President of SNB's National Division, at about this time made another analysis which, while underestimating losses for November and December of 1973 (while estimated at $4 million they were in fact in excess of $10 million) and deleting certain intangibles described as "Other Assets", concluded that Walston had an adjusted capital base of $14,840,000 to cover nonsubordinated liabilities of $32,960,000 and subordinated liabilities of $28,000,000.

On January 31, 1974, SNB received a copy of Walston's December financial statement showing a loss for the month of $2.2 million and on February 13, 1974, Mr. Bagg noted on the continuing history sheet that "unless there is some redistribution of the burdens of dW's liquidation there will be no assets available to repay the obligations of SNB."

After receiving on or about March 1, 1974, Walston's January financial statement and preparing an updated liquidation schedule, Mr. Bagg concluded that only a maximum of $2,074,000 would have been available for subordinated lenders as of January 31 and that "[i]t is unlikely that the $2,074M will survive the liquidation of the company" and that "[i]t is apparent that dW will be defunct by the end of March."

This Court finds it difficult to conceive of more conclusive proof from which to conclude that SNB had reasonable cause to believe that Walston was insolvent at the time the payments were made on March 26, 1974, than has been amassed here. The *coup de grace* is, of course, Mr. Bagg's own admission in a March 1, 1974 entry on the continuing history sheet that the payments would be "arranged to obviate, to the extent possible, any problem with a preference." In short, all the parties, and particularly SNB, not only had reasonable cause to believe, but knew full well, that Walston was insolvent immediately prior to and at the time of the transfer herein.

### III

As to the questions of whether the payments by DGF and BOA to SNB were transfers of Walston's property, and whether the payments were for Walston's, or DGF's or BOA's benefit, or whether they were in payment of Walston's debt or in settlement of the claims against DGF or for some other purpose, there appears to be no dispute with respect to the fact that on March 26, 1974, SNB received a check from DGF for $2,233,333 and from BOA for $366,667 which it negotiated on March 27.

As to the first of such checks, under the terms of the DGF Debenture, as well as the Pledge Agreement, it was Walston which was recognized as the registered owner and was entitled to payments of principal and interest.

The DGF Debenture was a subordinated promise by DGF to pay Walston $5,733,333 on June 30, 1983, with subordinated provisions similar to those in the SNB-Walston Subordinated Loan Agreement. The debenture itself provided for payment only to Walston and to no other entity; it was not payable to order or bearer. The debenture

was subject to being "snapped back" at Walston's request but it could not be prepaid without the prior written consent of the Exchange. It could also not be pledged, transferred, assigned or otherwise encumbered or disposed of without Exchange approval.

The Pledge Agreement between Walston and SNB did not alter Walston's position as the only entity designated to receive payment on the debenture. In this regard, as noted above, the Pledge Agreement provided in pertinent part as follows:

"2. *Rights.* [Walston] agrees with [SNB] as follows, it being understood, however, that any provision of this Agreement as it pertains to the assignment, sale, transfer or other disposition of the DGF Debenture shall be subject to the condition that the DGF Debenture may not be assigned, sold, transferred or otherwise disposed of except to a transferee, purchaser, assignee or other holder approved by the New York Stock Exchange, Inc.:

(A) Unless and until an Event of Default (as defined in the Loan Agreement) shall have occurred and be continuing [Walston] shall be entitled to receive any interest or payments of principal on the DGF Debenture;

(B) If any Event of Default shall have occurred and while the same is continuing interest and principal paid upon or in respect of the DGF Debenture or any part thereof shall be paid directly to and shall be retained by [SNB] and held by it pursuant to the rights and remedies of a secured party under the Uniform Commercial Code as in effect at the time in New York.
\* \* \* "

Thus, the Pledge Agreement does not attempt to substitute SNB for Walston or otherwise alter Walston's rights to demand payment of the debenture.

As to the second check from BOA to SNB of $366,667 on March 26, 1974, it is clear, as plaintiff points out, that this sum is the difference between the $2,866,667 DGF Debenture which secured BOA's loan to Wal-

ston and the $2,500,000 amount of the loan itself. Thus, when the BOA DGF Debenture was paid to BOA at Walston's direction, BOA was in fact overcompensated in the amount of $366,667. Walston accordingly directed BOA to pay that amount over to SNB, by negotiating to SNB a DGF check in that amount, which would in turn be treated by SNB in satisfaction of Walston's outstanding subordinated loan obligation. The $366,667 obligation thus ran in Walston's favor and was, at its direction, transferred to SNB by BOA. Viewed in this context, it is clear that the payment, made at Walston's direction, is just as much a disposition of Walston's property as is DGF's payment to SNB discussed above.

In reaching this conclusion as to both transfers in question, the Court specifically notes that the parties themselves, in executing the transfers viewed them in this light. Indeed, this is apparent in the letters which are contained in Exhibit D to the complaint that the parties to the transfers delivered on March 26, 1974, which in essence provided as follows:

(a) Walston requested, and DGF agreed with Exchange approval to pay, the remaining $2,233,333 principal amount of the DGF Debenture. Walston requested that the payment be made to SNB rather than to Walston. SNB received a check for $2,233,333 and consented that the moneys so received be applied to the reduction of Walston's Senior Subordinate Note.

(b) Walston also requested that $366,667 be paid to SNB by BOA. This payment (the "Excess Payment") represented the difference between the face amount of the BOA DGF Debenture and the amount of BOA's subordinated loan to Walston. SNB received a check from BOA for this amount "for the account of Walston" and applied it, with Walston's consent, to the reduction of the principal amount of Walston's Senior Subordinated Note.

(c) SNB received from BOA $200,000 as part of a side agreement between the banks that evidently was intended to make them more nearly *pari passu*.

In answer to this rather formidable array of evidence indicating that the transfers in question were in fact transfers of Walston's property in satisfaction of an antecedent debt, i. e., SNB's subordinated loan, defendant refers to no specific proof to the contrary but merely asks a series of questions, viz.:

(i) Since the checks SNB received were from DGF and BOA, not Walston, whose property was it?

(ii) Even if DGF received the funds used for the payment from Walston, was DGF obligated to pay it over to SNB, or did it pay it over in settlement of the claims asserted in SNB's action against DGF and H. Ross Perot and his associates, as well as against Walston?

(iii) Which threat to DGF and Perot was more significant, SNB's being able to get a judgment against Walston or its ability to get a judgment against DGF and Perot?

As to the first of such questions, however, this Court finds that the evidence clearly shows that the payments to SNB were on obligations running to Walston made by DGF and BOA at Walston's direction and that such transactions qualify as transfers of the bankrupt's property under Section 1(30) of the Bankruptcy Act, 11 U.S.C. § 1(30). *See Smyth v. Kaufman,* 114 F.2d 40, 43 (2d Cir. 1940).

As to the last two questions, which raise questions as to whether these transfers were somehow in "settlement" of the SNB's state court suit, this Court cannot ignore Mr. Bagg's aforementioned admission on the continuing history sheet for the subordinated loan that DGF, Walston, SNB and presumably BOA were discussing as of March 1, 1974, 5 days after the state court suit was initiated, the distribution of the remaining DGF Debentures in a transaction which "would be arranged to obviate, to the extent possible, any problems with a preference." The parties may have attempted to achieve this result by designing the payments in settlement of its lawsuit against Walston, DGF, Perot, et al., but such an attempt will be to no avail. The closing documents specifically state that the payments would be and in fact were applied to reduce the antecedent indebtedness evidenced by the Senior Subordinated Note and this Court will so treat them. Accordingly, no real question of fact exists on this issue of whether or not the payments were transfers of Walston's property on account of an antecedent debt; it being clear to the Court as indicated above that they were.

In view of all of the foregoing it seems clear that there is no question of fact to be determined in these motions, defendant's cross motion must be and the same hereby is denied and plaintiff's motion must be and the same hereby is granted.

Settle judgment on notice.

SO ORDERED.