MOORE, Circuit Judge:
 

 Chemical Bank appeals from a judgment of the United States District Court for the Eastern District of New York, granting the
 
 *498
 
 plaintiff trustee in bankruptcy summary judgment on two counts alleging the payment of voidable preferences under § 60 of the Bankruptcy Act, 11 U.S.C. § 96(a) and (b). Chemical Bank also appeals from various interlocutory orders denying its motions to transfer, to add counterclaims, and to implead third parties. The district court held that the two payments in question were voidable preferences after concluding that the first payment was transferred within four months of bankruptcy and that there were no material issues of fact with respect to any of the other elements necessary to establish a voidable preference. We reverse the district court, 454 F.Supp. 341, with respect to the first payment on the ground that the transfer occurred more than four months before bankruptcy, and we remand the question of the second payment on the ground that there are material issues of fact present with regard to several of the necessary elements for a voidable preference. Chemical Bank’s motion to transfer is dismissed as moot, and on remand Chemical Bank is granted leave to
 

 renew its motions to add counterclaims and to implead third parties.
 

 I.
 

 This case stems from a set of complex contractual agreements between two broker dealers and two creditor banks in the early 1970s.
 
 [1]
 
 The two broker dealers are Wal-ston & Company, Inc., (“Walston”) and du-Pont Glore Forgan, Inc., (“DGF”). The two banks are Security National Bank (“SNB”) and the Bank of America National Trust and Savings Association (“BOA”). The Chemical Bank subsequently acquired SNB’s assets and assumed certain of its contingent liabilities, and was substituted as the defendant in this action on December 21,1976. For simplicity’s sake, SNB will be referred to as Chemical Bank.
 

 The series of transactions in dispute here began in November, 1972, when Chemical Bank agreed to lend broker-dealer Walston $5 million. Walston entered into a Subordinated Loan Agreement (“SLA”) with Chemical Bank for the $5 million
 
 [2]
 
 on No
 
 *499
 
 vember 27, 1972 and the SLA was duly approved by the New York Stock Exchange (“NYSE”).
 
 [3]
 
 On February 16, 1973 Walston entered into a substantially identical loan
 
 *500
 
 agreement with BOA in the amount of $2.5 million.
 

 As this Court has previously noted, a number of Wall Street brokerage firms were in deep financial trouble in the early 1970s.
 
 [4]
 
 In 1973 the Perot Interests
 
 [5]
 
 held a minority interest in Walston and a controlling interest in DGF. By June, 1973, DGF was in such serious financial difficulty that the NYSE ordered it to reduce its net capital ratio to less than 10-to-l by July 2,1973. The Perot Interests responded by orchestrating a realignment of Walston’s and DGF’s business. They proposed that Wal-ston and DGF operate as one entity under the name duPont Walston, Inc. Under the terms of the proposed realignment, Walston was to transfer $16.7 million in cash to DGF in return for $8.6 million in DGF subordinated debentures and $8.1 million in DGF preferred stock. The consent of Chemical Bank and BOA was essential to the consummation of the proposed realignment, but both banks refused to consent to such a diminution of Walston’s ability to repay their loans unless they received additional protection. Walston thus agreed to divide the proposed $8.6 million DGF debenture into two debentures with face amounts proportionate to Chemical Bank’s $5 million loan and BOA’s $2.5 million loan. Walston accordingly pledged a $5,733,333 DGF Debenture to Chemical and a $2,866,667 DGF Debenture to BOA. Walston’s Board approved the Realignment on July 1, 1973, and it was formally agreed to by DGF and Walston on July 2, 1973.
 

 To effect the pledge, on July 2, 1973 Chemical Bank and Walston entered into a Pledge Agreement (“PA”)
 
 [6]
 
 and an amendment to the SLA. The PA provided in Paragraph 1 that Chemical Bank was being given an immediate security interest in the DGF Debenture:
 

 .. . BORROWER has pledged with BANK, as pledgee, under the provisions of this Agreement and does hereby grant
 
 *501
 
 BANK a security interest in the Senior Subordinated Debenture, due June 30, 1983, of DGF in the principal amount of $5,733,333 payable to BORROWER (the ‘DGF Debenture’) as collateral security for the payment of the indebtedness represented by the Note.... ”
 

 The PA gave Walston a limited right to receive payments of interest or principal on the debenture, but not in the event of any default. The SLA was amended to conform with the PA. A new Paragraph 8 was added to the SLA stating that Paragraph 3 of the SLA (which consisted of a subordination and no-security provision) was to be construed consistently with the PA.
 
 [7]
 
 At the same time Walston and BOA executed a substantially identical Pledge Agreement granting BOA a security interest in the $2,866,667 DGF Debenture, and BOA’s loan agreement was amended accordingly. The DGF Debentures were issued at the time of the Realignment on July 2,1973, and Chemical Bank took immediate possession of the debenture pledged to it by Walston. The BOA also took possession of the DGF Debenture pledged by Walston.
 

 In January, 1974, at Walston’s request, DGF made prepayments to Walston on the DGF Debenture totalling $3.5 million. This reduced the collateral on Chemical Bank’s $5 million loan from $5.7 million to $2.2 million. After due protest, Chemical Bank commenced a state court action on February 26, 1974 against Walston, DGF, and others for,
 
 inter alia,
 
 the recovery of the prepaid $3.5 million. That suit was settled on March 26, 1974 by the payment from DGF to Chemical Bank of $2,233,333. At the same time BOA received a full payment of $2,866,667 on its DGF Debenture.
 
 [8]
 
 Pursuant to an agreement between Chemical Bank and BOA, BOA endorsed over to Chemical Bank a check for $366,666, repre-sentmg the difference between the $2,866,-667 DGF Debenture securing BOÁ’s loan and the $2,500,000 amount of the loan itself. It was understood by both Walston and Chemical Bank that these payments of $2,233,333 and $366,666 would be applied to the reduction of Walston’s Senior Subordinated Note.
 

 Walston petitioned for an arrangement under Chapter XI of the Bankruptcy Act on March 27, 1974, and was adjudicated a bankrupt on May 30,1974. The plaintiff, in his capacity as trustee in bankruptcy for duPont Walston, Inc., filed a 13 count complaint in October, 1974 in the Eastern District of New York alleging that the $2,233,-333 and $366,666 payments were transfers of Walston’s property recoverable as voidable preferences, fraudulent transfers under § 67(d) of the Bankruptcy Act, and fraudulent conveyances under New York law. Plaintiff filed a motion for summary judgment in September, 1977, and Chemical Bank filed a cross-motion for summary judgment a month later. Chemical Bank had previously filed motions to add counterclaims, to implead third parties, and to transfer.
 

 On July 12,1978, the district court granted the plaintiff’s motion for summary judgment and denied Chemical Bank’s motion for summary judgment (all of Chemical Bank’s interlocutory order motions were subsequently denied as well). The district court granted the plaintiff summary judgment on Counts One and Thirteen of the Complaint (and dismissed as moot the remaining counts), finding that the two March 26, 1974 payments constituted voidable preferences under § 60(a)(2) of the Bankruptcy Act. The court reached this result after concluding that Chemical
 
 *502
 
 Bank’s security interest in the $5,733,333 DGF Debenture attached on March 26,1974 when Chemical Bank received the proceeds of its collateral rather than on July 2, 1973 as specified in the PA. The district court found the parties intended such deferred attachment after reading the PA in the light of the SLA rather than the SLA in light of the PA and the SLA Amendment (whose new Paragraph 8 explicitly amended the subordination clause of the SLA). The district court further found that since there were no material issues of fact with respect to any of the other essential elements necessary to establish a voidable preference, both the $2,233,333 and the $366,666 payments qualified as such.
 
 Allegaert v. Chemical Bank,
 
 454 F.Supp. 341 (E.D.N.Y.1978).
 

 It is the position of the defendant Chemical Bank that the district court erred in granting plaintiff summary judgment first because the larger transfer complained of actually occurred on July 2, 1973 with the perfection of the security interest created by the PA, and second because there are genuine issues of material fact present with regard to the necessary elements of a voidable preference. Chemical Bank also appeals from the district court’s interlocutory orders denying its motions to transfer, to implead third parties, and to counterclaim.
 

 The plaintiff trustee adopts the district court’s interpretation of the PA and SLA, and argues here that Chemical Bank could not have perfected a security interest because the DGF Debenture was neither a “security” nor an “instrument” within the meaning of the New York Uniform Commercial Code (“NYUCC”). The plaintiff trustee also argues that, even if the transfers in question are not voidable preferences, the subordination provisions of the SLA remain in effect. Finally, the plaintiff trustee claims that the district court should have awarded interest on the judgment from the date the preferential transfer occurred rather than from the date when the action was commenced.
 

 We first turn to the question of whether the $2,233,333 payment to Chemical Bank constitutes a voidable preference.
 

 II.
 

 To establish that a voidable preference has occurred, a plaintiff must prove each of the seven elements set forth in § 60 of the Bankruptcy Act, 11 U.S.C. § 96(a) and (b). These elements have been summarized as follows:
 

 “a debtor
 

 (1) making or suffering a transfer of his property,
 

 (2) to or for the benefit of a creditor,
 

 (3) for or on account of an antecedent debt [resulting in a depletion of the estate],
 

 (4) while insolvent, and
 

 (5) within four months of bankruptcy ... [and]
 

 (6) the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class. . . . [and provided that]
 

 (7) the creditor receiving or to be benefited by the preference had reasonable cause to believe that the debtor was insolvent.” 3
 
 Collier Bankruptcy
 
 ¶ 60.02 (14th ed. 1976).
 

 The failure of the plaintiff to prove any one of these elements would bar the entry of summary judgment on Counts One and Thirteen.
 

 Elements (1) and (5) of the requirements for a voidable preference—namely that there was a transfer of the debtor’s property within four months of bankruptcy—must be read in conjunction with § 60(a)(2) of the Bankruptcy Act. That section specifies the time at which a transfer is deemed to be made:
 

 “For the purposes of subdivisions a and b of this section, a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee.” 11 U.S.C. § 96(a)(2).
 

 
 *503
 
 In other words, if the PA between Chemical Bank and Walston created a security interest in the $5,733,333 DGF Debenture, and that security interest was perfected on July 2, 1973, then the $2,233,333 million transfer from DGF to Chemical Bank would have occurred more than four months before Walston’s bankruptcy, and the plaintiff’s voidable preference claim in Count One must fail.
 
 Evans v. Valley West Shopping Center, Inc.,
 
 567 F.2d 358, 360 (9th Cir. 1978). Chemical Bank insists that the PA did indeed perfect a security interest in the DGF Debenture, and therefore maintains that the $2,233,333 transfer must be deemed to have occurred on July 2, 1973 rather than March 26, 1974. It is thus necessary — given that all the relevant facts are indisputed — for this Court to consider whether the July 2, 1973 PA between Chemical Bank and Walston constitutes a security interest, and furthermore whether it was perfected on July 2, 1973.
 

 The parties have agreed that the NYUCC controls the determination of the nature of any security interest in the DGF Debenture. For a security interest to be valid and enforceable against both the debt- or and third parties, three requirements must be met: the debtor must sign a description of the collateral, the security interest must attach, and the security interest must be perfected. Section 9-203 of the NYUCC provides that “a security interest is not enforceable against the debtor or third parties unless .. . the debtor has signed a security agreement which contains a description of the collateral”. Specificity of description is not required as long as the property is “reasonably identified”, § 9-110 NYUCC, and indeed, this lenient standard is clearly satisfied in the instant case by Paragraph One of the PA, where the $5,733,333 DGF Debenture is identified as the collateral security.
 

 Section 9-204(1) of the NYUCC provides that a security interest attaches when (a) there is agreement that it attach, (b) value is given by the secured party, and (c) the debtor has rights in the collateral. The interest attaches as soon as all these events have taken place “unless explicit agreement postpones the time of attaching”. There is no question here that the parties agreed that a security interest attach, that Chemical Bank gave value, and that Walston had rights in the collateral. Paragraph 1 of the PA explicitly states that “BORROWER has pledged with BANK, as pledgee, under the provisions of this Agreement and does hereby grant BANK a security interest in the Senior Subordinated Debenture, due June 30, 1983, of DGF in the principal amount of $5,733,333 payable to BORROWER ... as collateral security”. Chemical Bank gave value by the simple fact that it took a security interest to secure repayment of the debt already owed it by Walston, a debt which Chemical Bank was entitled to call on an accelerated basis (due to the fundamental change in Walston’s character caused by the realignment with DGF). And Walston certainly had rights in the collateral, given Paragraph 2 of the PA — captioned “Rights” —which reads “Unless and until an Event of Default shall have occurred and be continuing BORROWER shall be entitled to receive any interest or payments of principal in the DGF Debenture”.
 

 Despite the unmistakable language in Paragraph 1 of the PA memorializing the parties’ intent that a security interest attach, the plaintiff trustee maintains that the parties actually intended to postpone the time of attachment until an event of default. As such, he invokes the language of § 9-204(1) stating that attachment occurs immediately “unless explicit agreement postpones the time of attaching”. This exacting qualification must be strictly construed, however, and only an unequivocal showing of an explicit agreement can effect a postponement. An agreement to postpone attachment which is merely inferred from words or conduct is not an “explicit” agreement within the meaning of the NYUCC.
 
 See Barton v. Chemical Bank,
 
 577 F.2d 1329, 1336 (5th Cir. 1978). In recognition of the ordinary expectation that a security interest attach immediately upon an extension of credit, the exacting requirement of explicitness is intended “to ensure the automatic attaeh
 
 *504
 
 ment of the security interest to the collateral” immediately upon the satisfaction of the three prerequisites listed above. W. Davenport and D. Murray,
 
 Secured Transactions
 
 § 3.03 (1978). When this rigorous standard of explicitness is applied to the facts and documents of this case, the reasoning of the district court and the arguments of the plaintiff trustee must be rejected.
 

 After resolving “an apparent ambiguity in contractual language” and pointing to certain “extrinsic evidence” supporting that interpretation, the district court concluded that the parties agreed to postpone attachment until an event of default.
 
 Allegaert
 
 at 346, 347. The district court acknowledged that Paragraph 1 of the PA states an intent to create a security interest attaching without delay: “BORROWER has pledged with the BANK, as pledgee, under the provisions of this Agreement and does hereby grant the BANK a security interest in the Senior Subordinated Debentures .. .. ” However, the district court also read Paragraph 2 of the PA to mean the parties intended to postpone attachment until an event of default. Paragraph 2 reads:
 

 “(A) Unless and until an Event of Default (as defined in the Loan Agreement) shall have occurred and be continuing BORROWER shall be entitled to receive any interest or payments of principal on the DGF Debenture;
 

 (B) If any Event of Default shall have occurred and while the same is continuing interest and principal paid upon or in respect of the DGF Debenture or any part thereof shall be paid directly to and shall be retained by BANK and held by it pursuant to the rights and remedies of a secured party under the Uniform Commercial Code as in effect at the time in New York. Any cash at the time held by BANK under this Agreement shall be applied by BANK to the payment of the costs and expenses of BANK and its agents and counsel and to the payment of the indebtedness represented by the Note and any interest accrued thereon.”
 

 The district court’s interpretation of this Paragraph was based in part on a reading of two recent cases decided by the Court of Appeals for the Third Circuit,
 
 In re Dolly Madison Industries, Inc.,
 
 351 F.Supp. 1038 (E.D.Pa.1972),
 
 aff’d mem
 
 480 F.2d 917 (3d Cir. 1973), and
 
 In the Matter of Copeland,
 
 531 F.2d 1195 (3d Cir. 1976).
 

 The
 
 Dolly Madison
 
 case involved a stock purchase agreement which explicitly stated that in the event of default, the escrow agent shall deliver the stock certificates to the seller, “whereupon seller’s rights and obligations in and to the shares represented by the certificates ... shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code.... ”
 
 Dolly Madison
 
 at 1040. The
 
 Copeland
 
 case involved a pledge agreement that also called for the delivery and sale of stock upon default; however, the Third Circuit found that the pledge agreement “neither explicitly nor implicitly postpones the attachment or perfection of the security interest. Rather, it is completely silent as to the time the [pledgee] achieves the status of a secured creditor with a perfected security interest”.
 
 Cope-la nd at
 
 1202. The Third Circuit held that the attachment of the security interest in
 
 Dolly Madison
 
 was postponed by the explicit agreement of the parties, and that the parties in
 
 Copeland
 
 intended the security interest to attach immediately. The district court found the language of the PA in the instant case “lies in between the extremes of the
 
 Dolly Madison
 
 and
 
 Copeland
 
 cases” since although the PA does not condition attachment upon default with the explicitness of
 
 Dolly Madison,
 
 “it does indicate that [Chemical Bank] is to obtain the ‘rights and remedies of a secured party under the Uniform Commercial Code’
 
 only
 
 as to interest and principal
 
 paid to it after the event of a continuing default
 
 ”.
 
 Allegaert
 
 at 346.
 

 The district court resolved this “apparent ambiguity in contractual language” by turning to the Amendment of the SLA that added a new Paragraph 8 to the SLA. That new Paragraph 8 reads in part: “BORROWER and BANK have entered
 

 
 *505
 
 into as of July 2,1973, a Pledge Agreement . . . and the provisions of Paragraph 3 hereof shall be construed consistently therewith”. Paragraph 3 of the SLA provides for the subordination of the Senior Subordinated Note and waives Chemical Bank’s right to take security under a banker’s lien. Nevertheless, despite the clear language in the new Paragraph 8 of the SLA commanding that Paragraph 3 of the SLA be construed consistently with the provisions of the PA, the district court explicitly held that the PA must be interpreted consistently with the SLA’s subordination clause. This produced the anomalous result of interpreting the meaning of a later amenda-tory document on the basis of an earlier superseded document written without any knowledge of the later document. In short, the district court read the documents backwards, interpreting the amendment through the lens of the original rather than the original through the lens of the amendment, as is the usual practice. The district court compounded this error by then turning to “extrinsic evidence” completely beyond the four corners of the documents in order to resolve the contractual ambiguities it founded existed. The use of such extrinsic evidence is totally irrelevant in the context of a ruling on a motion for summary judgment, and cannot be considered even as tangentially persuasive. See
 
 Heyman v. Commerce and Industry Ins. Co.,
 
 524 F.2d 1317 (2d Cir. 1975), and
 
 Hartford Accident & Indemnity Co. v. Wesolowski,
 
 33 N.Y.2d 169, 171-72, 305 N.E.2d 907, 908-09, 350 N.Y.S.2d 895, 897-98 (1973).
 

 The district court’s characterization of the present case as falling “in between the extremes” of
 
 Dolly Madison
 
 and
 
 Copeland
 
 is inaccurate. In
 
 Dolly Madison,
 
 the agreement unequivocally provided that the creditor’s security interest would attach only upon an event of default, and then went on to describe the remedies that would become available: “In the event that [pledgor] shall be in default in payment of principal or interest under its promissory note ... the escrow agent ... shall deliver the certificates to seller, whereupon seller’s rights and obligations ... shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code.”
 
 Dolly Madison
 
 at 1040. As the Third Circuit noted in
 
 Copeland,
 
 the key to the deferred attachment in
 
 Dolly Madison
 
 was the “whereupon” clause, which necessarily implied that “the seller achieved the status of a secured party with a perfected security interest only after default”.
 
 Cope-la nd
 
 at 1204. In
 
 Copeland,
 
 the pledge agreement was completely silent as to the time at which the pledgor would achieve the status of a secured creditor, and thus the security interest was deemed to attach immediately. The critical factor was the
 
 Copeland
 
 lacked the kind of explicit postponement of the time for attachment that was present in the “whereupon” clause of the
 
 Dolly Madison
 
 agreement.
 

 In the instant case, Paragraph 1 of the PA expressly provides for immediate attachment of the security interest. Paragraph 2 merely confirms Walston’s rights to the proceeds of the collateral prior to default and Chemical Bank’s rights to those proceeds after default. Paragraph 2 neither grants a security interest nor sets forth all of Chemical Bank’s remedies. There is no “whereupon” clause in the PA explicitly postponing attachment. And the PA is not completely silent as to the time when Chemical Bank becomes a secured creditor, for Paragraph 1 clearly states that a security interest is being created and immediately granted to Chemical Bank. As such, the delayed attachment language of
 
 Dolly Madison
 
 is inapplicable to the instant PA, as is the complete silence situation of
 
 Copeland.
 
 In short, the Chemical Bank-Walston PA provided for immediate attachment more clearly than either the
 
 Copeland
 
 or
 
 Dolly Madison
 
 agreements.
 

 Furthermore, a common sense reading of the PA and SLA reveals that the parties expressly provided for the immediate attachment of the security interest. The language of Paragraph 1 in the PA is simple and precise: “BORROWER has pledged with the BANK as pledgee under the provisions of this Agreement and does hereby grant the Bank a security interest in the
 
 *506
 
 Senior Subordinated Debentures . . . . ” Given the clarity of Paragraph 1 and § 9-204(l)’s strict requirement for an explicit statement of any intent to postpone attachment, the PA’s security interest can only be deemed to be deferred by the operation of strong language explicitly contradicting the normal expectation of immediate attachment. Paragraph 3 of the SLA, upon which the district court relied, does not provide such language. Paragraph 3 of the SLA did indeed restrict Chemical Bank’s right to take security, set off, and be prior to other creditors. However, the SLA was amended on July 2, 1973 in order to give effect to the PA. A new Paragraph 8 was added to the SLA, and it reads as follows:
 

 “BORROWER and BANK have entered into as of July 2, 1973, a Pledge Agreement ... and the provisions of Paragraph 3 herewith [i. e., the amended SLA] shall be construed consistently therewith [i. e., with the Pledge Agreement].”
 

 Thus the amended SLA was to be construed consistently with the PA, and not
 
 vice-ver-sa.
 
 Paragraph 8 modified Paragraph 3 so that it was to be construed consistently with the PA. If the restrictive provisions of Paragraph 3 had not been so modified, the PA would have been rendered meaningless, for it would have created a “security interest” which attaches only after default, totally destroying the value of the pledge.
 
 [9]
 
 Paragraph 2 of the PA, which the district court pointed to as indicating that Chemical Bank was to become a secured creditor only after an event of default, did not govern the creation of the security interest — it merely governed the disposition of the proceeds of the collateral, an aspect of Wal-ston’s and Chemical Bank’s debtor-creditor relationship that was entirely separate from the creation of the security interest. Paragraph 2 simply concerned the parties’ rights in the proceeds of the DGF Debenture, not the attachment of Chemical Bank’s interest in the Debenture.
 

 Thus an examination of the relevant documents and an application of the pertinent caselaw to the facts of this case reveal that the parties intended to create an immediately attaching security interest, and did indeed do so.
 

 For a security interest to be valid and enforceable against both the debtor and third parties, however, there must be perfection in addition to a description of the collateral and attachment. Perfection is usually achieved by the filing of financing statement or by the possession of the collateral by the secured party. A security interest in instruments can be perfected only by possession. Section 9-305 of the NYUCC states: “A security interest in . . . instruments . .. may be perfected by the secured party’s taking possession of the collateral.” Possession is required in order to provide notice to other parties that the property in question is encumbered.
 
 See
 
 J. White and R. Summers,
 
 Handbook on the Law Under the Uniform Commercial Code
 
 § 23-10 at 814 (1972).
 

 Article 9 of the NYUCC defines “instrument” as:
 

 “a security (defined in Section 8-102) or any other writing which evidences a right to the payment of money and ... is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment.” NYUCC § 9-105(l)(g).
 

 The DGF Debenture satisfies either of those alternative definitions. First, it was
 
 *507
 
 a writing that evidenced the right to the payment of money, and was of a type which in the ordinary course of business is trans-ferrable by delivery with any necessary in-dorsement or assignment.
 
 See
 
 Folk, Article Eight: A Premise and Three Problems, 65 Mich.L.Rev. 1379,1398 n.74 (1967), and Israels, Investment Securities as Negotiable Paper, 13 Bus.Law 676, 682 (1958).
 

 Second, the DGF Debenture also qualifies as an Article 9 instrument because it is within NYUCC § 8-102’s definition of “security”. Section 8-102(l)(a) defines “security” as an instrument (not in the Article 9 sense) which:
 

 “(i) is issued in bearer or registered form; and
 

 (ii)is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
 

 (iii)is either one of a class or series by its terms is divisible into a class or series of instruments; and
 

 (iv)evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.”
 

 Plaintiff concedes that element (i) is met by the DGF Debenture. As for element (ii), subordinated debentures of brokerage houses are “commonly ... recognized in any area in which [they are] issued or dealt in as a medium for investment”. This Court recently recognized that the short-term subordinated notes of a brokerage house were securities under the Securities Act of 1933 and the Securities Exchange Act of 1934, presupposing recognition as media for investment.
 
 Exchange National Bank v. Touche Ross & Co.,
 
 544 F.2d 1126 (2d Cir. 1976);
 
 see also United Housing Foundation, Inc. v. Forman,
 
 421 U.S. 837, 847-48, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975). Subordinated lending is an important facet in brokerage firms. Subordinated loan agreements are considered to be media for investment,
 
 see
 
 2 Gilmore,
 
 Security Interests in Personal Property
 
 983 (1965), and Calligar, Purposes and Usages of Subordination Agreements, 23 Bus.Law 33, 34 (1967), and subordinated debentures are “commonly dealt in for the purpose of financing and investment”. Practice Commentary to NYUCC § 8-102 (McKinney 1964). Element (iii) requires that the instrument be “one of a class or series or by its terms be divisible into a class or series of instruments”. Since two DGF Debentures were issued, one having been pledged to BOA and another to Chemical Bank, the “series or class” requirement is met: “minimum compliance with this formality requires that there be at least two instruments in a specified class or series, or that the single instrument be divisible into at least one additional instrument”. Folk, Article Eight: Investment Securities, 44 N.Car.L.Rev. 654, 662 (1966). The fact that element (iv) is satisfied is so obvious that it does not warrant discussion.
 

 It is undisputed that Chemical Bank took possession of the DGF Debenture in July, 1973, and the district court recognized this in its findings of fact.
 
 Allegaert
 
 at 342, 343. Thus, pursuant to § 9-305, Chemical Bank validly perfected its security interest in July, 1973.
 

 Section 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96, states in part that a voidable preference is a transfer of the debtor’s property within four months of the filing for bankruptcy. Section 60(a)(2) states that “a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee”. In other words, the date of the transfer of an instrument is deemed to be the time at which the security interest in the instrument was perfected. In the case at hand, Chemical Bank perfected its security interest in the DGF Debenture when it took possession of the instrument in July, 1973; the transfer thus occurred in July, 1973, a date more than four months before the filing of Walston’s bankruptcy. Therefore, the transfer at issue here is not
 
 *508
 
 a preferential transfer, the plaintiff trustee has failed to prove every element of a voidable preference, and Chemical Bank is presumptively entitled to summary judgment in its favor on Count One.
 

 Nevertheless, the plaintiff trustee argues that the payments received by Chemical Bank on the DGF Debentures were still prohibited by the subordination provisions in the SLA. The plaintiff trustee maintains that Paragraphs 3.1 and 6.4 of the SLA
 
 [10]
 
 detailing the subordination of Chemical Bank’s loan to Walston dictate that the payments received by Chemical Bank remain subordinated to senior claims, and thus constitute an impediment to Chemical Bank ever having collateral on that loan.
 

 However, as is clear from the above discussion, the parties amended the subordination and no-security provisions of the SLA by entering into the PA security interest. And under the NYUCC, the security agreement between Walston and Chemical Bank was effective as against creditors notwithstanding the existence of a subordination agreement. Section 9-201 of the NYUCC provides: “Except as otherwise provided by this Act a security interest is effective according to its terms between the parties, against purchasers of the collateral and against creditors.” This section has been called the “golden rule of Article Nine”, J. White and R. Summers,
 
 Handbook on the Law Under the Uniform Commercial Code
 
 § 25-12 at 938 (1972), and is fundamental to the treatment of security interests under the Code. In the words of one commentator, “What this [section] means is that the security agreement is the controlling document. It controls the rights and obligations between lender and borrower. It also binds third parties (e. g., ‘purchasers of the collateral and . . . creditors’).” T. Quinn,
 
 Uniform Commercial Code Commentary and Law Digest
 
 § 9-201[A] at 9-84 (1978).
 
 See also
 
 Official Comment to NYUCC § 9-201 (McKinney 1964). The validity of a security interest does not turn on the presence or absence of a subordination agreement, but a perfected security interest can certainly supersede and modify the effect of a subordination agreement. This superiority of a security interest over a subordination agreement is well-recognized by the experts in the field.
 
 See
 
 Calligar, Subordination Agreements, 70 Yale L.J. 376, 399 (1961), G. Gilmore, 2
 
 Security Interests In Personal Property
 
 983-84 (1965), and Leiby, Enforcement and the U.C.C., 23 Bus.Law 57 (1967).
 

 As the Code and commentators make clear, it is the operation of the security interest, not the subordination clause, which must be taken into account when determining the time and the nature of the transfer to Chemical Bank.
 
 [11]
 
 Since the $2,233,333 payment to Chemical Bank was made pursuant to the PA’s security interest, it is not affected by the subordination provisions of the SLA, and does not remain subordinated to senior claims. We have already held that the security interest created by the PA was perfected in July, 1973, more than four months before the filing of Walston’s bankruptcy petition; therefore the $2,233,333 payment cannot constitute a voidable preference, and we hereby grant summary judgment in favor of Chemical Bank on Count One.
 

 
 *509
 
 III.
 

 We now turn to the question of whether BOA’s March 26,1974 endorsement over to Chemical Bank of the $366,667 DGF check constitutes a voidable preference. As will be recalled, in February, 1973, Walston entered into a subordinated loan agreement with BOA in the amount of $2.5 million. In July, 1973 Walston entered into a Pledge Agreement with BOA in which Walston pledged a $2,866,667 DGF Debenture as collateral to cover the $2.5 million loan. That Pledge Agreement was substantially similar to the PA between Walston and Chemical Bank, and purportedly granted BOA a security interest in the $2,866,667 DGF Debenture pledged by Walston.
 

 In March, 1974, in the series of transactions precipitated by the settlement of Chemical Bank’s state court suit against Walston, DGF, the Perot Interests, and others, BOA received full payment on the $2,866,667 DGF Debenture pledged to it. Since the actual amount of BOA’s loan to Walston was only $2.5 million, BOA had in a sense been overpaid by $366,667. Walston thereupon directed BOA to endorse over to Chemical Bank a DGF check for $366,667, representing the difference between the amount of the Debenture and the amount of the loan, and BOA did so. It was understood by all the parties that this $366,667 would be applied to the reduction of Wal-ston’s Senior Subordinated Note.
 

 The district court held that BOA’s endorsement of the DGF check over to Chemical Bank constituted a voidable preference. The district court so held after finding there were no material issues of fact concerning Walston’s insolvency or the ownership of the $366,667 or for whose benefit it was paid.
 
 Allegaert
 
 at 348-51. We reverse the district court’s grant of summary judgment on Count 13 on the ground that there are indeed material questions of fact concerning these issues, and we remand for a trial in order that they may be resolved.
 

 A brief examination of the circumstances surrounding the endorsement of the $366,-667 check reveals the existence of several crucial issues of material fact. First of all, there is a genuine question as to whether the property transferred was actually Wal-ston’s. In finding that Walston was entitled to payment on the principal and interest on the DGF Debentures on March 26, 1974, the district court relied on correspondence among the parties at the time of the settlement and the fact that Walston was the registered owner of the debentures. The district court concluded that DGF’s payment to Chemical Bank was at Wal-ston’s direction, and thus qualified as a transfer by Walston under § 1(30) of the Bankruptcy Act. Nevertheless, the fact remains that the $366,667 DGF check was made out to BOA and endorsed over to Chemical Bank, immediately raising a question as to whether those funds can truly be considered to have come from Walston.
 

 Furthermore, Paragraph 2 of the PA specifies that Walston was not entitled to payment of interest or principal after an event of default. Walston began liquidating its brokerage business in January, 1974, and arguably was in default as of that date. And assuming Walston was insolvent on March 26, 1974,
 
 [12]
 
 Walston also had no right to receive interest or principal on the DGF Debenture under the terms of the PA. Thus, there is a considerable question as to whether Walston was entitled to any payments on the DGF Debentures as of March 26, 1974, and it is a question that can only be answered after further detailed factual findings are conducted as to when Walston defaulted and became insolvent.
 

 
 *510
 
 Another example of the factual uncertainties present in the record before us is the question of whether the $366,667 was a part of funds allegedly converted by Wal-ston. That is, even if the money was Wal-ston’s property, was it part of a specific fund Chemical Bank was entitled to under the PA but which Walston allegedly converted in January, 1974? It is well-settled that when a debtor obtains property through fraud or conversion, and then restores that property to its rightful owner anytime before bankruptcy, there is no voidable preference.
 
 See Manly v. Ohio Shoe Co.,
 
 25 F.2d 384, 385 (4th Cir. 1928), and
 
 In re Meiselman,
 
 105 F.2d 995, 998 (2d Cir. 1939). Therefore, if Walston did convert Chemical Bank’s property in January, 1974, and if the funds Chemical Bank received from BOA may be traced back to those converted by Walston, then those funds cannot be recovered by the plaintiff trustee. These circumstances certainly raise issues of material fact which preclude an entry of summary judgment.
 

 There is also a genuine question as to the purpose of the $366,667 payment. It is not clear whether it was paid on account of Walston’s antecedent debt or made for the benefit of BOA or DGF. The payment resulted from the settlement of Chemical Bank’s state court suit against Walston, DGF, and the Perot Interests. In that suit, Chemical Bank: complained that Walston was in default under the SLA, and sought to recover $5 million on the Note; complained of DGF’s $3.5 million prepayment to Walston while Walston was in default, and sought to recover funds from both Walston and DGF on the ground such funds had been converted; complained that its consent to the Realignment had been induced by the misrepresentations of the Perot Interests, and that the Perot Interests caused DGF to prepay its Debentures and then improperly caused Walston to pay the same sum back to DGF in partial payment of Walston’s obligations to Electronic Data Systems, Inc., Perot’s computer business; and complained that $40 million worth of transfers from Walston to DGF were fraudulent conveyances, and sought the appointment of a receiver for Walston and DGF plus an injunction barring further transfers. Clearly, DGF, Walston, and the Perot Interests each had a substantial interest in avoiding the litigation promised by this suit, for if even a part of the relief sought by Chemical Bank had been granted, all their interests would have suffered considerably. When Chemical Bank received the $2.6 million from DGF and BOA, it gave releases to all the defendants in its state court suit and stipulated to the action’s dismissal with prejudice. Given these circumstances, there is certainly a genuine issue of material fact as to whether the $366,667 was endorsed over to Chemical Bank for the benefit of DGF, BOA, or Walston.
 

 Accordingly, we reverse the district court’s grant of summary judgment for the plaintiff trustee on Count Thirteen, and remand for further proceedings not inconsistent with this opinion. This reversal means, of course, that the district court’s ruling that Counts Fourteen through Eighteen of the plaintiff trustee’s Complaint are moot is liable to reexamination on a count by count basis.
 

 IV.
 

 All of the interlocutory orders appealed from by Chemical Bank or the plaintiff trustee are affected to varying degrees by the holdings of the instant opinion and by the interim settlement of
 
 Alleg-aert v. Perot, et aL,
 
 466 F.Supp. 516, in the Southern District of New York. In response to Bankruptcy Judge Babitt’s approval of the
 
 Allegaert v. Perot
 
 settlement in November, 1979 and the stipulations of dismissal in January, 1980, both parties here have agreed to the withdrawal of Chemical Bank’s motion to transfer to the Southern District of New York. Furthermore, although the district court’s denial of Chemical Bank’s motions to add counterclaims and to implead third parties was not an abuse of discretion, this Court finds the settlement of the
 
 Allegaert v. Perot
 
 suit to be such a substantial change of circumstances that Chemical Bank should have an opportunity to renew those motions in order
 
 *511
 
 to present new arguments as to why the amended pleadings it seeks should be granted. On remand, therefore, Chemical Bank is granted leave to renew its motions to add counterclaims and to implead third parties. And in light of our grant of summary judgment to Chemical Bank on Count One and our reversal and remand on Count Thirteen, we dismiss as moot the plaintiff trustee’s appeal concerning the date when the interest on the judgment begins to run. Finally, Chemical Bank’s motion for leave to file a supplemental brief or to direct the excision of certain portions of the plaintiff’s reply brief is denied.
 

 V.
 

 In summary, we hold that Chemical Bank did perfect a valid security interest in the DGF Debenture on July 2, 1973, and conclude that the March 26, 1974 payment of $2,233,333 from DGF to Chemical Bank did not constitute a voidable preference. The district court’s grant of summary judgment on Count One in favor of the plaintiff trustee is accordingly reversed, and we hereby grant Chemical Bank summary judgment on Count One. We further hold that genuine issues of material fact exist with respect to whether the endorsement over to Chemical Bank of the $366,687 check from DGF to BOA constitutes a voidable preference, and we therefore reverse the district court’s grant of summary judgment on Count Thirteen and remand it for further proceedings. On remand, Chemical Bank is granted leave to renew its motions to add counterclaims and to implead third parties. Chemical Bank’s motion to transfer is dismissed on the ground that it is moot, as is the plaintiff trustee’s motion concerning the date when interest on the judgment begins to run. And Chemical Bank’s motion to submit a supplemental brief or to direct the excision of portions of the plaintiff trustee’s reply brief is denied.
 

 [1]
 

 . This Court has considered litigation stemming from these events twice before.
 
 See: Allegaert v. Perot,
 
 548 F.2d 432 (2d Cir.),
 
 cert, denied,
 
 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977), and
 
 Allegaert v. Perot,
 
 434 F.Supp. 790, 565 F.2d 246 (2d Cir. 1977). The same proceedings are also reported at 78 F.R.D. 427 and 466 F.Supp. 516 (SDNY, 1978).
 

 [2]
 

 . Paragraphs 3 and 6.4 of the SLA read:
 

 3.SUBORDINATION AND NO SET-OFF
 

 3.1 The Note shall be a Senior Subordinated Note ranking senior to BORROWER’S Senior Subordinated Convertible Debentures Due September 30, 1982 and senior to BORROWER’S Senior Subordinated Notes Due June 30, 1982 issued under the terms of that certain Purchase Agreement between BORROWER and Charleston Investment Company (“Charleston”) dated July 5, 1972, as amended August 18, 1972, October 12, 1972, and November 27, 1972 and senior to all other indebtedness of BORROWER which is or will be subordinated to other indebtedness of BORROWER, except that the Note shall rank
 
 pari passu
 
 with other subordinated indebtedness of BORROWER to commercial banks and shall be subordinated to Senior Claims (as defined below) as follows:
 

 (a) The right of Bank as holder of the Note and of each successor holder thereof to receive payment of each instalment of principal of and interest on the Note (each such instalment being hereinafter referred to as such “Subordinated Instalment”) shall be irrevocably subordinate in right of payment and subject to the prior payment or provision for payment in full of all Senior Claims of other present and future creditors of BORROWER and in the event of the appointment of a receiver or trustee of BORROWER or Insolvency of BORROWER (as defined in subpara-graph (c) below), its liquidation pursuant to the Securities Investor Protection Act of 1970 (“SIPA”) or otherwise, its bankruptcy, assignment for the benefit of creditors, reorganization whether or not pursuant to bankruptcy laws or any other marshalling of the assets and liabilities of BORROWER (any such event being referred to as “Insolvency Proceedings”), the holder of the Note shall not be entitled on account of such Subordinated Instalment to participate or share rat-ably or otherwise in the distribution of the assets of BORROWER until all Senior Claims shall have been fully satisfied or provision has been made therefor, it being understood that provision shall be deemed for purposes of Paragraph 3.1 hereof to have been made for payment in full of all Senior Claims if the assets of BORROWER available to pay the same shall be adequate in amount to satisfy all Senior Claims fully, regardless of whether any assets shall have been liquidated or shall
 
 *499
 
 be in any manner set aside for that purpose. To give effect to the foregoing, in case of Insolvency Proceedings, any distribution of assets of BORROWER or interest or principal payments to which the holder of the Nóte would be entitled on account of such Subordinated Instalment except for these subordination provisions shall be paid or delivered pro rata to the holders of Senior Claims until such holders have received from all sources the equivalent to payment in full of such Senior Claims or provision for such payment has been made and the holder of the Note shall, to the extent of such distributions or interest or principal payments so paid or delivered to the holders of Senior Claims, be subrogated to the rights of the holders of such Senior Claims to further distributions and interest or principal payments on account thereof;
 

 (b) BANK as holder of the Note agrees, and each successor holder thereof by its acceptance thereof shall agree, that if it shall receive any payment on account of such Subordinated Instalment at or prior to the maturity thereof and if immediately after any such payment the Aggregate Indebtedness of BORROWER will exceed one thousand two hundred percent (1,200%) of its Net Capital or such greater or lesser percent as may be made applicable to BORROWER from time to time by the Exchange or a governmental agency or body having appropriate authority or its Net Capital will be less than the minimum dollar amount required by the Rules of the Board of Directors of the Exchange in effect at such time or such greater or lesser dollar amount as may be made applicable to BORROWER by the Exchange or a governmental agency or body having appropriate authority (whether or not such holder shall have had any knowledge or notice of such fact at the time of such payment), such payment shall be rescinded and the amount so paid shall be repaid by it to BORROWER and shall be and remain subject to the subordination provisions hereof; provided, however, that any suit for recovery of any such payment must be commenced within two (2) years of the date of such payment;
 

 (c) The term “Insolvency of BORROWER” when used herein in relation to any Subordinated Instalment shall mean insolvency of BORROWER within the meaning of section 1(19) of the Bankruptcy Act;
 

 (d) The term “Senior Claim” when used in this Agreement in relation to any Subordinated Instalment shall mean a claim arising out of any matter or event occurring prior to the maturity of such Subordinated Instalment, whether stated, accelerated or suspended except to the extent it has been subordinated in right of payment to any other claim against BORROWER;
 

 (e)The provisions of Paragraph 3.1 hereof are solely for the purpose of defining the relative rights of the holders of the Note and the holders of Senior Claims and nothing contained in this Agreement or in the Note shall impair, as between BORROWER, its creditors other than holders of Senior Claims and the holder of the Note, the obligation of BORROWER, which is unconditional and absolute, to pay the holder of the Note as and when the same shall become due and payable in accordance with its terms and the terms of this Agreement, or shall affect the relative rights of the holder of the Note and creditors of BORROWER other than the holders of Senior Claims.
 

 3.2 BANK agrees that it is not taking and will not take or assert as security for the payment of the Note or the payment of interest thereon any security interest in or lien upon, whether created by contract, statute or otherwise, any property of BORROWER or any property in which BORROWER may have an interest, which is or at any time may be in the possession or subject to the control of BANK. BANK hereby waives, and further agrees that it will not seek to obtain payment of the Note in whole or in any part by exercising any right of set-off it may assert or possess whether created by contract, statute or otherwise. Any agreement between BORROWER and BANK (whether in the nature of a general loan and collateral agreement or security or pledge agreement or otherwise) shall be deemed amended hereby to the extent necessary so as not to be inconsistent with the provisions of this Paragraph 3.2.
 

 * * * * * *
 

 6.4
 
 Events of Default.
 
 In case an Event of Default shall occur, then, notwithstanding the provisions of clause (b) of Paragraph 6.2, the Note and each instalment thereof and accrued interest thereon shall forthwith become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby waived by BORROWER;
 
 provided, however,
 
 that payment of principal of and interest on the Note shall remain subordinated to the extent provided in Paragraph 3.1 hereof. For purposes of this Agreement and of BORROWER’S secured demand notes, subordinated accounts and other agreements evidencing or governing BORROWER’S subordinated indebtedness, a liquidation as described in clause (1) of Paragraph 6.1 shall be deemed to have commenced on the date on which an Event of Default shall have occurred.
 

 [3]
 

 . Although today such a subordinated loan agreement would be required — pursuant to 17 C.F.R. § 240.15 c 3-ld(c) — to state that the
 
 *500
 
 parties will not modify the subordination provision, in 1972 there was no such requirement, and the SLA was silent on that point.
 

 [4]
 

 .
 
 See Allegaert v. Perot,
 
 565 F.2d 246 at 248 (2d Cir. 1977).
 

 [5]
 

 . This Court has adopted the term “Perot Interests” to refer to H. Ross Perot and the persons, companies, and entities affiliated, controlled, or related to him.
 
 See Allegaert
 
 v.
 
 Perot,
 
 565 F.2d 246 at 248 (2d Cir. 1977).
 

 [6]
 

 . Paragraphs 1 and 2 of the PA read:
 

 1.
 
 Security Interest.
 
 In consideration for the consent of BANK to the entering into by BORROWER of the Master Agreement, dated as of July 2, 1973, among BORROWER, du-Pont Glore Forgan Incorporated (“DGF”), PHM & Co. and Charleston Investment Company and to the consummation of the transactions contemplated by such Master Agreement to be consummated, BORROWER has pledged with BANK, as pledgee, under the provisions of this Agreement and does hereby grant BANK a security interest in the Senior Subordinated Debenture, due June 30, 1983, of DGF in the principal amount of $5,733,333 payable to BORROWER (the “DGF Debenture”) as collateral security for the payment of the indebtedness represented by the Note and the performance by BORROWER of its other obligations under the Loan Agreement.
 

 2.
 
 Rights.
 
 BORROWER agrees with BANK as follows, it being understood, however, that any provision of this Agreement as it pertains to the assignment, sale, transfer or other disposition of the DGF Debenture shall be subject to the condition that the DGF Debenture may not be assigned, sold, transferred or otherwise disposed of except to a transferee, purchaser, assignee or other holder approved by the New York Stock Exchange, Inc.:
 

 (A) Unless and until an Event of Default (as defined in the Loan Agreement) shall have occurred and be continuing BORROWER shall be entitled to receive any interest or payments of principal on the DGF Debenture:
 

 (B) If any Event of Default shall have occurred and while the same is continuing interest and principal paid upon or in respect of the DGF Debenture or any part thereof shall be paid directly to and shall be retained by BANK and held by it pursuant to the rights and remedies of a secured party under the Uniform Commercial Code as in effect at the time in New York. Any cash at the time held by BANK under this Agreement shall be applied by BANK to the payment of the costs and expenses of BANK and its agents and counsel and to the payment of the indebtedness represented by the Note and any interest accrued thereon.
 

 [7]
 

 . “11. Paragraph 8 is hereby added to the Loan Agreement as follows, and present Paragraph 8 shall become Paragraph 9:
 

 ‘8.
 
 Pledge.
 
 BORROWER and BANK have entered into as of July 2, 1973, a Pledge Agreement substantially in the form of Exhibit C hereto providing for the pledge by BORROWER with BANK of a Senior Subordinated Debenture, due June 30, 1983, of du-Pont Glore Forgan Incorporated in the principal amount of $5,733,333 to secure the payment by BORROWER of the indebtedness evidenced by the Note, and the provisions of Paragraph 3 hereof shall be construed consistently therewith.’ ”
 

 [8]
 

 . Both these prepayments were approved by the NYSE.
 

 [9]
 

 . It can hardly be contended that the parties intended such an absurd result. They went to the trouble of negotiating and executing both a PA that stated it was given in consideration for Chemical Bank’s consent to the Realignment and an Amendment that expressly modified the SLA in order to give effect to the PA. Under the plaintiff trustee’s analysis, however, all this labor was for naught, since the only way Chemical Bank could have gotten something for its consent to the Realignment would have been if there were no claims senior to Chemical Bank’s, an eventuality that would have required Walston to have ceased doing business and yet remain solvent. Chemical Bank and Walston clearly intended that Chemical Bank receive something in exchange for its consent to the Realignment, and a security interest that does not hold up when the debtor is in financial difficulty is worthless.
 

 [10]
 

 . See n.2
 
 supra
 
 for Paragraphs 3.1 and 6.4 of the SLA.
 

 [11]
 

 . Chemical Bank also argues that since the subordination provisions of Paragraph 3.1(a) of the SLA were to be triggered only upon insolvency, Chemical Bank’s subordination was by definition inchoate and did not preclude either the discharge of — or a
 
 fortiori
 
 the giving of security on — Walston’s debt.
 
 First National Bank of Hollywood v. American Foam Rubber Cory.,
 
 530 F.2d 450 (2d Cir.),
 
 cert. denied,
 
 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976),
 
 rev’g,
 
 306 F.Supp. 593 (S.D.N.Y., 1969). Since an inchoate subordination agreement is not triggered until bankruptcy, Chemical Bank points out, the parties may modify it to provide for security. Calligar, Subordinated Agreements, 70 Yale L.J. 376, 399 (1961). Chemical Bank therefore argues that the SLA’s subordination clause did not restrict Walston’s right to pledge property to Chemical Bank. Since this Court believes it is the security interest, not the subordination clause, that is controlling here, we express no opinion on this point.
 

 [12]
 

 . The district court found that Walston was insolvent on March 26, 1974 on the basis of schedules filed in support of its Chapter XI petition and the fact that Walston filed for bankruptcy the next day. Chemical Bank raises questions concerning the accuracy and authority of the schedules, and points out that no evidence as to Walston’s insolvency in January, 1974 was considered by the district court even though the transfer must be deemed to have occurred upon Walston’s initial default. Without deciding the date or degree of Walston’s default and insolvency, this Court simply notes that there are material issues of fact concerning these issues that only can be resolved on remand.